NICHOLAS ESPOSITO ET AL. *v.* SIMKINS INDUSTRIES, INC., ET AL.
(SC 18019)

Rogers, C. J., and Norcott, Katz, Zarella and Schaller, Js.

Argued January 9—officially released April 1, 2008

*Joseph J. Passaretti, Jr.*, with whom, on the brief, was *Melissa A. Murello,* for the appellant (defendant Connecticut Insurance Guaranty Association).

*Anne Kelly Zovas,* with whom, on the brief, was *Rachel M. Pattison,* for the appellee (named defendant).

Opinion

KATZ, J. The principal issue on appeal is whether, under the Connecticut Insurance Guaranty Association Act (guaranty act), General Statutes §§ 38a-836 through 38a-853, a self-insured employer that initially is liable for a workers' compensation claim as the last insurer on the risk is permitted to seek apportionment, pursuant to General Statutes § 31-299b,[1] against the defendant Connecticut Insurance Guaranty Association (association),[2] for an insolvent insurance carrier's share of

[1] General Statutes § 31-299b provides in relevant part: "If an employee suffers an injury or disease for which compensation is found by the commissioner to be payable according to the provisions of this chapter, the employer who last employed the claimant prior to the filing of the claim, or the employer's insurer, shall be initially liable for the payment of such compensation. The commissioner shall, within a reasonable period of time after issuing an award, on the basis of the record of the hearing, determine whether prior employers, or their insurers, are liable for a portion of such compensation and the extent of their liability. If prior employers are found to be so liable, the commissioner shall order such employers or their insurers to reimburse the initially liable employer or insurer according to the proportion of their liability. . . ."

[2] "The association is a nonprofit legal entity established by General Statutes § 38a-839 and governed by the [guaranty act] . . . . The association was established in order to reimburse, to a limited extent, covered claims against insolvent insurers." *Hunnihan* v. *Mattatuck Mfg. Co.*, 243 Conn. 438, 439 n.1, 705 A.2d 1012 (1997). "The association has other beneficiaries in addition to workers' compensation claimants. . . . Pursuant to General Statutes § 38a-839, the association '[f]or the purposes of administration and assessment . . . [is] divided into three separate accounts: (a) The workers'

workers' compensation benefits. The association appeals from the decision of the workers' compensation review board (board) affirming the decision of the workers' compensation commissioner for the eighth district (commissioner), ordering the association to reimburse the named defendant, Simkins Industries, Inc. (Simkins), for the portion of the benefits that Simkins otherwise would have been able to obtain from an insolvent insurer. We affirm the board's decision.

The record discloses the following undisputed facts and procedural history. The named plaintiff, Nicholas Esposito (decedent), began working for Simkins in 1948, and continued in that employment relationship until May 16, 1984. In February, 1999, he filed a claim for workers' compensation benefits, pursuant to General Statutes § 31-294c, alleging that he had sustained an occupational disease, including asbestosis, which arose out of and in the course of his employment with Simkins. The decedent died in 2000, and Angelina Esposito, the decedent's wife and executrix of his estate, was substituted as claimant in the underlying action.

Throughout the decedent's employment history with Simkins, Simkins either fully insured its workers' compensation risk or self-insured that risk pursuant to General Statutes § 31-284. Simkins was self-insured, however, during the last period of the decedent's employment, from April 1, 1965, through May 16, 1984.[3]

compensation insurance account; (b) the automobile insurance account; and (c) an account for all other insurance to which sections 38a-836 to 38a-853, inclusive, apply.' " Id., 451 n.8.

[3] Simkins' insurance coverage during the decedent's employment was as follows:

| Date | Carrier |
| --- | --- |
| 09/01/48 through 12/31/49 | American Mutual Liability Insurance Company |
| 01/01/50 through 09/30/53 | Liberty Mutual Insurance Company |
| 10/01/53 through 09/30/63 | American Mutual Liability Insurance Company |
| 09/30/63 through 09/30/64 | No coverage record |
| 10/01/64 through 02/28/65 | American Employers Insurance Company |
| 03/01/65 through 03/31/65 | Employers' Liability Assurance Corporation |
| 04/01/65 through 05/16/84 | Self-insured |

On the basis of the varied insurance coverage during the course of the decedent's employment history, the commissioner apportioned responsibility for the decedent's occupational disease amongst Simkins' insurers, including Simkins itself as a self-insurer.[4] One of those insurers, American Mutual Liability Insurance Company (American Mutual), had declared bankruptcy and no longer was in business.

In accordance with § 31-299b, as the last insurer on the risk, Simkins administered the claim, but retained the right to pursue a claim against prior insurance carriers for an apportionment of liability and recovery of benefits expended on the claim. In its role administering the claim pursuant to § 31-299b, Simkins had reached a settlement with the parties that resolved all issues regarding the decedent's claim, except that of apportionment. Angelina Esposito received a $200,000 settlement to resolve her claim against Simkins and its insurers. The insurers, together with the association, had agreed to resolve the issue of apportionment of liability subsequent to settlement, and all parties agreed to the reasonableness of the settlement figure. In accordance with the percentages of responsibility allocated by the commissioner, Simkins then sought reimbursement as follows: $63,400 from the association, on behalf of American Mutual; $21,000 from Liberty Mutual Insurance Company; $2400 from American Employers Insurance Company; and $400 from Employers' Liability Assurance Corporation.

---

[4] The commissioner assessed percentages of liability as follows:

| | |
|---|---|
| American Mutual Liability Insurance Company | 31.70 percent |
| No coverage record | 2.80 percent |
| Liberty Mutual Insurance Company | 10.49 percent |
| American Employers Insurance Company | 1.17 percent |
| Employers' Liability Assurance Corporation | 0.23 percent |
| Self-insurance | 53.61 percent |
| | 100.00 percent |

In the proceedings before the commissioner, the association acknowledged that workers' compensation claims that previously had been the responsibility of American Mutual were being administered by the association pursuant to General Statutes § 38a-841.[5] The association contended, however, that it was not obligated to reimburse Simkins for American Mutual's proportionate share of the settlement because Simkins' claim was not a "covered claim" under § 38a-841 (1), as that term is defined by General Statutes § 38a-838 (5).[6] Specifically, the association contended that the

[5] General Statutes § 38a-841 (1) provides in relevant part: "Said association shall: (a) Be obligated to the extent of the covered claims existing prior to the determination of insolvency and arising within thirty days after the determination of insolvency, or before the policy expiration date if less than thirty days after the determination, or before the insured replaces the policy or causes its cancellation, if he does so within thirty days of such determination, provided such obligation shall be limited as follows: (i) With respect to covered claims for unearned premiums, to one-half of the unearned premium on any policy, subject to a maximum of two thousand dollars per policy; (ii) with respect to covered claims other than for unearned premiums, such obligation shall include only that amount of each such claim which is in excess of one hundred dollars and is less than three hundred thousand dollars, except that said association shall pay the full amount of any such claim arising out of a workers' compensation policy, provided in no event shall (A) said association be obligated to any claimant in an amount in excess of the obligation of the insolvent insurer under the policy form or coverage from which the claim arises, or (B) said association be obligated for any claim filed with the association after the expiration of two years from the date of the declaration of insolvency unless such claim arose out of a workers' compensation policy and was timely filed in accordance with section 31-294c; (b) be deemed the insurer to the extent of its obligations on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent; (c) allocate claims paid and expenses incurred among the three accounts, created by section 38a-839, separately, and assess member insurers separately (i) in respect of each such account for such amounts as shall be necessary to pay the obligations of said association under subdivision (a) of subsection (1) of this section subsequent to an insolvency; (ii) the expenses of handling covered claims subsequent to an insolvency; (iii) the cost of examinations under section 38a-846; and (iv) such other expenses as are authorized by sections 38a-836 to 38a-853, inclusive. . . ."

[6] General Statutes § 38a-838 (5) provides in relevant part: " 'Covered claim' means an unpaid claim . . . which arises out of and is within the coverage

claim fell within the exception to the definition of a covered claim of "any claim by or for the benefit of any . . . insurer . . . as subrogation recoveries or otherwise . . . ." General Statutes § 38a-838 (5). The association also claimed that Simkins could not seek apportionment because it had failed to exhaust its administrative remedies prior to making its claim for apportionment pursuant to § 31-299b. The commissioner rejected the association's contentions and ordered the insurers and the association to reimburse Simkins for their respective apportionment shares. The association appealed from that decision to the board, which affirmed the decision on the ground that the decision is controlled by *Connecticut Ins. Guaranty Assn.* v. *State*, 278 Conn. 77, 896 A.2d 747 (2006), and *Doucette* v. *Pomes*, 247 Conn. 442, 724 A.2d 481 (1999). This appeal followed.[7]

On appeal, the association renews the two claims that it made before the commissioner: (1) Simkins is not entitled to seek apportionment; and (2) even if it were, it is precluded from doing so in the present case because it failed to exhaust its administrative remedies. The association further contends that this case is not controlled by *Doucette* and its progeny because those cases did not involve apportionment under § 31-299b. We reject the association's claims.

I

It is undisputed that, under the exception to covered claims in § 38a-838 (5), insurers are not entitled to

and subject to the applicable limits of an insurance policy to which sections 38a-836 to 38a-853, inclusive, apply issued by an insurer, if such insurer becomes an insolvent insurer after October 1, 1971, and (A) the claimant or insured is a resident of this state at the time of the insured event . . . provided the term 'covered claim' shall not include (i) any claim by or for the benefit of any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise . . . ."

[7] The association appealed from the decision of the board to the Appellate Court pursuant to General Statutes § 31-301b. Thereafter, we transferred

obtain reimbursement under the guaranty act. The first issue we must decide, therefore, is whether Simkins, as a self-insurer, is an insurer for purposes of the guaranty act and, consequently, is precluded from recovering from the association.

At the outset, we set forth the applicable standard of review. Because the facts are undisputed, the question before us solely is one of statutory interpretation. Accordingly, "our review is plenary and we must determine whether the trial court's conclusions of law are legally and logically correct and find support in the stipulated facts." (Internal quotation marks omitted.) *Doucette* v. *Pomes*, supra, 247 Conn. 453. "Cases that present pure questions of law . . . invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Internal quotation marks omitted.) *Pasquariello* v. *Stop & Shop Cos.*, 281 Conn. 656, 663, 916 A.2d 803 (2007).

Although § 38a-838 (5) previously has been subjected to judicial scrutiny, this court never has considered whether that interpretation applies in the context of a self-insurer seeking apportionment under § 31-299b. Moreover, "although statutory interpretation by the commission—an administrative agency—is required, the statute to be interpreted is not part of the Workers' Compensation Act assigned to the commission for enforcement, but, rather, is a provision of the guaranty

the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

act. Consequently, although . . . the commission had the authority to interpret § 38a-838 [5], we afford no special deference to its interpretation." *Hunnihan* v. *Mattatuck Mfg. Co.*, 243 Conn. 438, 449, 705 A.2d 1012 (1997). Therefore, we turn to our well settled tenets of statutory construction to guide us in the present case.

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Pasquariello* v. *Stop & Shop Cos.*, supra, 281 Conn. 663–64.

We begin our analysis, therefore, with an examination of the pertinent text of the guaranty act. Section 38a-838 (5) provides in relevant part: " 'Covered claim' means an unpaid claim . . . which arises out of and is within the coverage and subject to the applicable limits of an insurance policy to which sections 38a-836 to 38a-853, inclusive, apply issued by an insurer, if such insurer becomes an insolvent insurer after October 1, 1971, and (A) the claimant or insured is a resident of this state

at the time of the insured event . . . *provided the term
'covered claim' shall not include (i) any claim by or
for the benefit of any . . . insurer . . . as subroga-
tion recoveries or otherwise . . . .*" (Emphasis added.)
As we previously have noted: "The guaranty act does
not define the term 'insurer.'[8] It merely defines '[i]nsol-
vent insurer,' which provides for the circumstances in
which an insurer is to be considered insolvent so that
its obligations will be met by the association; General
Statutes § 38a-838 [6]; and 'member insurer,' which
defines the type of insurer that is required to be a
member of the association and to be subject to the
association's assessments. General Statutes § 38a-838
[7]." *Doucette* v. *Pomes*, supra, 247 Conn. 455; see also
General Statutes § 38a-839 ("[a]ll insurers defined as
member insurers in subdivision [7] of section 38a-838
shall be members of said association as a condition
of their authority to transact insurance in this state").
Neither definition is instructive on the issue before us—
whether a *self-insurer* is an insurer for purposes of the
guaranty act. Indeed, the association does not contend
that Simkins is a member insurer. In considering the
question before us, however, we are not writing on a
blank slate. We therefore turn to the two cases cited
by the parties in which this court previously explored
the language, legislative history and purpose of the guar-
anty act—*Hunnihan* v. *Mattatuck Mfg. Co.*, supra, 243
Conn. 451, relied upon by the association, and *Doucette*

---

[8] As we recognized in *Doucette* v. *Pomes*, supra, 247 Conn. 457, General
Statutes § 38a-1 provides general definitions that apply throughout title 38a,
entitled "Insurance," unless a contrary meaning appears from the context
in which those terms are used. Among those generally defined terms is
"insurer." See General Statutes § 38a-1 (11). As we explain later in this
opinion, in *Doucette*, we examined the general definitions under § 38a-1 and
concluded that, to the extent that they shed light on the question in the
present case, the definitions support the conclusion that self-insurers are
not insurers. *Doucette* v. *Pomes*, supra, 457.

v. *Pomes*, supra, 442, deemed to be controlling by Simkins.[9]

Although the history of the guaranty act and the purpose in creating the association have been well documented, they bear repeating. "The association was established for the purpose of providing a limited form of protection for policyholders and claimants in the event of insurer insolvency. The protection it provides is limited based upon its status as a nonprofit entity and the method by which it is funded. Specifically, the association is a nonprofit legal entity created by statute to which all persons licensed to transact insurance in the state must belong. See General Statutes §§ 38a-838 [7] and 38a-839. When an insurer is determined to be insolvent under § 38a-838 [6], the association becomes obligated pursuant to § 38a-841, to the extent of covered claims within certain limits." *Hunnihan* v. *Mattatuck Mfg. Co.*, supra, 243 Conn. 451.

*Hunnihan* is instructive because it is one of this court's first cases to explore the interplay between the obligations imposed by the Workers' Compensation Act and the guaranty act. In *Hunnihan*, the court had to decide whether the association was obligated to pay a proportionate contribution toward a workers' compen-

[9] In enacting No. 03-49, § 1, of the 2003 Public Acts, the legislature renumbered the subsections of the pertinent definitions in § 38a-838 at issue in *Hunnihan* v. *Mattatuck Mfg. Co.*, supra, 243 Conn. 438, and in *Doucette* v. *Pomes*, supra, 247 Conn. 442. For purposes of clarity, we have substituted the subsection numbers as denoted in the current revision of the General Statutes in our discussion of those cases. The definitions at issue in those cases are in all essential respects for purposes of this appeal the same as the current definitions. See Public Acts 2003, No. 03-49, § 1 (redesignating definition of: "covered claim" under subsection [6] as subsection [5]; "insolvent insurer" under subsection [7] as subsection [6]; and "member insurer" under subsection [8] as subsection [7]). We note, however, that, in an apparent oversight, the legislature neglected to change the subsection reference to the definition of "member insurer" in General Statutes § 38a-839. Again, for purposes of clarity, we have substituted the current subsection in our reference to that statute.

sation award, pursuant to § 31-299b, when an insurer from whom reimbursement otherwise could have been sought by the employer's last insurer on the risk, Fireman's Fund, became insolvent. Id., 439–40. Because, in order to be reimbursable, a claim against the association must be a "covered claim" under § 38a-838 (5), the court began its analysis with that definition. Id., 449–51. The association had relied on the exclusion to that definition providing that the term "covered claim shall not include any amount due any . . . insurer . . . as subrogation recoveries or otherwise . . . ." (Internal quotation marks omitted.) Id., 450; see General Statutes § 38a-838 (5). Specifically, the association read the phrase "or otherwise" to exclude the claim, contending that this phrase was intended to preclude any claims not already specifically precluded as "subrogation recoveries . . . ." Id., 447–48, 450. In response, Fireman's Fund asserted that the phrase "or otherwise" modified "subrogation recoveries," so that only claims based on subrogation or akin to subrogation recoveries were excluded from the definition of a covered claim. Id., 450. Fireman's Fund contended that, "if the legislature had intended to bar absolutely all claims by insurers, it could have done so explicitly rather than by employing a broad, catchall phrase of uncertain meaning." Id. We endorsed the association's broad reading of § 38a-838 (5), concluding that the language "encompasses all amounts claimed by insurers as reimbursement." Id.

The court reasoned that this reading was consistent with the history and purpose behind the guaranty act. "An interpretation of the covered claim definition that excludes claims by insurers is in accord with this legislative purpose to provide protection for policyholders and claimants from insurer insolvency. The exclusion of claims by insurers leaves the risk of insurer insolvency on the insurance industry. The result is that poli-

cyholders, who in effect fund the association, pay only for protection for fellow policyholders and claimants in the event that an insurer becomes insolvent." Id., 452. Accordingly, the court determined that the association was not obligated to reimburse Fireman's Fund, the last insurer on the risk for the insolvent insurer's proportionate share of the award, because a claim by the last insurer for reimbursement is not a covered claim as defined by § 38a-838 (5). Id.

Thereafter, in *Doucette* v. *Pomes*, supra, 247 Conn. 456, the court determined that the plaintiff, a self-insurer under the Workers' Compensation Act, was not an "insurer" under § 38a-838 (5), and therefore was not precluded from asserting an otherwise valid claim and recovering from the association under the guaranty act. The underlying facts can be summarized briefly as follows. Gerald Doucette, Jr., an employee who had sustained personal injuries in the course of his employment, instituted an action against two individuals pursuant to General Statutes § 31-293, which authorizes an injured employee to seek recovery from a third party, other than the employer, for work-related injuries caused by that third party. Id., 445–46. Doucette's employer, the Metropolitan District Commission (Metropolitan), which had chosen to meet its statutory workers' compensation coverage obligation through self-insurance, intervened as a plaintiff in the action, seeking to recover for the workers' compensation payments already made and for future payments that might be awarded to Doucette. Id., 448, 450–51. Thereafter, Doucette withdrew his complaint, and the defendants responded to Metropolitan's intervening complaint by asserting the guaranty act as a special defense. Id., 451. Specifically, the defendants asserted that "Metropolitan is an insurer within the meaning of the guaranty act and therefore is precluded from recovering from the association because § 38a-838 [5] excludes from 'cov-

ered claims' 'any amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise . . . .' " Id. They contended that the term insurer included self-insurer, and therefore no express reference to the latter was necessary. Id., 456. This court agreed with Metropolitan that, as a self-insurer, it was not an insurer for purposes of the guaranty act. Id.

In making that determination, we began with the exception to covered claims under § 38a-838 (5) barring recovery by any "reinsurer, insurer, insurance pool, or underwriting association . . . ." (Internal quotation marks omitted.) Id., 455–56. Because the pertinent definitions were not set forth under the guaranty act, the court looked to the general definitions provided under General Statutes § 38a-1, which apply generally to title 38a, entitled "Insurance," unless the context indicates otherwise. Id., 456–57. First, the court looked to § 38a-1 (10), which provides the general definition of " '[i]nsurance.' " Id., 456. The court remarked that, under this definition, "the legislature defines insurance as the assumption of another's risk for profit. An employer that self-insures for workers' compensation purposes retains its own risk; it does not assume the risk of another. Moreover, it does not receive consideration. It is merely fulfilling its obligations under the Workers' Compensation Act to ensure that its workers will receive compensation under the appropriate circumstances. Therefore, according to the language of § 38a-1 (10), the definition of insurance does not include self-insurance for purposes of the guaranty act." Id., 456–57. The court also rejected the proposition that self-insurers fall within the general definition of insurer as entities or combinations of persons "doing any kind or form of insurance business"; General Statutes § 38a-1 (11); reasoning that "[t]he fact that a self-insuring employer has chosen to retain its own workers' com-

pensation risk rather than purchase insurance does not transform a company's business to that of insurance, that is, the employer is not 'doing any kind or form of insurance business' within the meaning of § 38a-1 (11)." *Doucette* v. *Pomes*, supra, 247 Conn. 457. Indeed, the court pointed to the numerous other types of insurers defined, but not self-insurers, as evidence that the legislature had intended the enumerated types of insurers to be exclusive. Id.

The court in *Doucette* found further support for its conclusion in the legislative history of the guaranty act.[10] Id., 459–61. The court noted that, "[a]lthough the legislative history . . . does not contain any discussion of the definition of 'insurer,' there is ample evidence that the guaranty act was 'substantially the same as a model bill adopted by the National Association of Insurance Commissioners [insurance association], which is an organization of the insurance commissioners of the fifty [s]tates.' " Id., 460. The court pointed to equally ample evidence from the insurance association's report demonstrating that association's intent that self-insurers are not insurers for purposes of state guaranty acts. Id., 461–63. Finally, the court noted that the legislature expressly has defined "insurer" so as to include self-insurers in the no-fault motor vehicle insurance context, but not in the guaranty act.[11] Id., 463. Although this omission "[did] not lead ineluctably to the conclusion that it intended to exclude self-insurers in the latter area . . . it is an additional factor militat-

---

[10] Additionally, the court recognized the "substantial authority" from treatises and other jurisdictions "for the position that self-insurance is not insurance at all." *Doucette* v. *Pomes*, supra, 247 Conn. 458.

[11] General Statutes § 38a-363 provides in relevant part: "As used in sections 38a-17, 38a-19 and 38a-363 to 38a-388, inclusive . . .

"(b) 'Insurer' or 'insurance company' includes a self-insurer . . . ." See also *Conzo* v. *Aetna Ins. Co.*, 243 Conn. 677, 683, 705 A.2d 1020 (1998) ("upon electing to become a self-insurer, [the defendant city of] West Haven . . . became an insurer" for purposes of uninsured motorist coverage).

ing in favor of excluding self-insurers from the defini-
tion of insurers for purposes of § 38a-838 [5]. It is
reasonable to assume that the legislature, having explic-
itly demonstrated its intention that the definition of
'insurer' includes self-insurers for purposes of our no-
fault motor vehicle statutes, would have been equally
clear with respect to the guaranty act if its intention
had been the same." Id., 463–64.

As one might surmise from the foregoing discussion,
the association relies on *Hunnihan*, contending that
Simkins, like Fireman's Fund, is the last insurer on the
risk seeking its proportionate contribution of a workers'
compensation award pursuant to § 31-299b because a
former insurer from whom reimbursement otherwise
could be sought became insolvent. Simkins, on the other
hand, likens itself to Metropolitan, the employer in
*Doucette*, which was not licensed to transact insurance
in the state, but merely had chosen to meet its statutory
workers' compensation coverage obligation through
self-insurance. We agree with Simkins that, like Metro-
politan, "it retained its character as an employer that
simply elected to pay the expenses associated with its
employees' work-related accidents. Although this is
commonly referred to as self-insuring, there was no
transfer of risk, which is generally considered to be an
essential element of an insurance relationship."
*Doucette* v. *Pomes*, supra, 247 Conn. 459. "The fact that
a self-insuring employer has chosen to retain its own
workers' compensation risk rather than purchase insur-
ance does not transform a company's business to that
of insurance, that is, the employer is not 'doing any
kind or form of insurance business' within the meaning
of ['insurer' under] § 38a-1 (11)."[12] Id., 457.

[12] We also find the association's reliance on *Hunnihan* misplaced because
the status of Fireman's Fund as an insurer was never in dispute; rather the
issue was whether all amounts claimed by insurers as reimbursement, or only
those akin to subrogation recoveries, were barred. The court in *Hunnihan*
merely held that § 38a-838 (5) excluded all amounts due an insurer, even
an insurer whose liability is premised on being the last insurer under § 31-

We note that, in the nine years since our decision in *Doucette*, the legislature has revisited the definitional section of the guaranty act, § 38a-838, on three occasions, but has made no revisions to the definition of covered claims to indicate its disagreement with our conclusion therein that a self-insurer is not an insurer. See Public Acts 2003, No. 03-49, § 1; Public Acts 2004, No. 04-174, § 5; Public Acts 2005, No. 05-140, § 2. In the absence of compelling evidence to the contrary, "we have characterized the failure of the legislature to take corrective action [in such cases] as manifesting the legislature's acquiescence in our construction of a statute." (Internal quotation marks omitted.) *Rivera* v. *Commissioner of Correction*, 254 Conn. 214, 252, 756 A.2d 1264 (2000); see, e.g., *Dodd* v. *Middlesex Mutual Assurance Co.*, 242 Conn. 375, 386, 698 A.2d 859 (1997) (finding support for position that insurer is not third party under General Statutes § 31-293 [a] from legislature's failure to amend statute when revisiting it to address court's decisions treating "third party" and "tortfeasor" interchangeably); *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 297, 695 A.2d 1051 (1997) (concluding that legislature's failure to amend General Statutes § 31-301b to address this court's interpretation of that statute to impose final judgment predicate to workers' compensation appeal despite revisiting that statute "provides adequate support for our disinclination to overrule controlling precedent and thereby 'effect an amendment by the process of judicial interpretation' ").

As the board's decision in the present case reflects, this reasoning was embraced recently by the court in *Connecticut Guaranty Ins. Assn.* v. *State*, supra, 278 Conn. 77. In that case, Karen Gagliardi, a state employee

299b. *Hunnihan* v. *Mattatuck Mfg. Co.*, supra, 243 Conn. 452. Indeed, the fact that the court never examined the general definitions relevant for insurance under § 38a-1, including that of "insurer," underscores the fact that the *status* of Fireman's Fund was not in dispute, only the nature of the claim.

acting within the course of her employment, was injured in a two car motor vehicle accident. Id., 79–80. The driver of the other vehicle had been discharged from Elmcrest Psychiatric Institute (Elmcrest) earlier that day. Id., 79. Gagliardi initiated a negligence action against the driver and Elmcrest. Id., 80. At the time of the accident, Elmcrest was insured by an insolvent insurer. Id. The state, which was self-insured at the time of the accident, paid Gagliardi benefits, and pursuant to § 31-293, sought to recover those benefits from Elmcrest. Id. The state subsequently obtained indemnity coverage for its compensation claims, but, under the terms of that original agreement, because the association had not yet approved the state's claim for reimbursement of Elmcrest's debt, the state's insurer would have received the recovery due on that claim. Id. The association then brought a declaratory judgment action disclaiming any obligation to reimburse the state, contending that the claim was "for the benefit of" an insurer and thus was not a " 'covered claim' " under § 38a-838 (5). Id., 81. Thereafter, the state and its indemnity carrier executed an amendment to their insurance policy whereby the carrier waived any claim to funds recovered by the state in the underlying action. Id. The trial court rejected the association's claim, concluding that, because of the waiver, the funds at issue were not for the benefit of an insurer. Id. On appeal, this court agreed that the state was a self-insured employer entitled to reimbursement by the association. Id., 81–82. In reaching that conclusion, the court noted the uncontested principle from *Doucette* that a self-insurer is not an insurer for purposes of the guaranty act. Id., 84 n.6. The court rejected the association's contention that the state's claim was really one "for the benefit of" an insurer, the indemnity carrier, reasoning that the status of the claim before execution of the waiver could not be restored without impermissibly interfering with con-

tractual relations between the state and the indemnity carrier. Id., 84–85. The court also rejected the association's contention that permitting the state to recover would thwart the legislature's expressed desire to preserve the association's resources. Id. "In fact, the association's primary purpose, the reimbursement of claims made against failed insurers, certainly is served by affording the state recovery in the present case, where, but for reimbursement, the state's claim would go unsatisfied due to insurer insolvency." Id., 86.

Similarly, although we acknowledge the association's warning in the present case that a result of our determination could be the significant depletion of its assets, that factor does not convince us that our reasoning in *Doucette* was flawed. Indeed, "the legislature has accounted for the possibility that the association might, at times, incur substantial liability. See General Statutes § 38a-841 (1) (c) ('[i]f the maximum assessment, together with the other assets of said association in any account, does not provide in any one year in any account an amount sufficient to make all necessary payments from that account, the funds available may be prorated and the unpaid portion shall be paid as soon thereafter as funds become available')." *Connecticut Ins. Guaranty Assn.* v. *State*, supra, 278 Conn. 86. In fact, this court also has noted that, "[i]n general, the legislative objective was to make the [association] liable to the same extent that the insolvent insurer would have been liable under its policy. . . . *Connecticut Ins. Guaranty Assn.* v. *Union Carbide Corp.*, 217 Conn. 371, 390, 585 A.2d 1216 (1991) (association may not use exhaustion or nonduplication of recovery provisions to avoid its responsibilities for paying claims that should have been covered by insolvent excess insurer). . . . *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, [278 Conn. 779, 791–92, 900 A.2d 18 (2006)]." (Internal quotation marks omitted.) *Giglio* v. *American Economy Ins.*

*Co.*, 278 Conn. 794, 815, 900 A.2d 27 (2006). Therefore, "an interpretation of the guaranty act that automatically would shift liability . . . to the nearest solvent insurer when liability does not rest there already would do violence to the legislatively established scheme." Id., 815–16.

Finally, the association contends that, although under *Doucette* a self-insurer is not an insurer for purposes of *§ 31-293*, it nevertheless is an insurer for purposes of *§ 31-299b*. This argument presupposes a difference between the association's role of protecting claims brought against insolvent liability carriers and insolvent workers' compensation carriers. This distinction is not reflected either in the guaranty act or in the Workers' Compensation Act.[13] Therefore, we decline to differentiate.

The association contends, however, that the question in the present case is whether the *association* is an employer or insurer, as those are the relevant parties to whom apportionment applies under § 31-299b. The association's attempt to distinguish its claim from the issue in *Doucette* by recasting the question as one of apportionment under the Workers' Compensation Act, rather than as one of its responsibilities under the guaranty act, is to no avail. In *Doucette*, our analysis began and ended with the guaranty act; we did not examine the association's liability under the Workers' Compensation Act or tort law for that matter, because the association's liability is dictated by the guaranty act. The Workers' Compensation Act would be relevant in any given case

---

[13] As part of this argument, the association contends that, in *Doucette*, pursuant to § 31-293, Metropolitan was acting as a plaintiff and the association was acting not as a defendant but merely as "the alternate payor of the defendant's liability as a negligent tortfeasor." Accordingly, the association posits that, in the § 31-293 context, the association "cannot refuse to reimburse a self-insurer or an insurer . . . ." We fail to see how this distinction advances the association's position.

only to the extent that it shed light on whether the insolvent insurer, whose obligation the association assumed, would be liable under that act.

The association further claims, however, that, under § 31-299b, a self-insured employer is permitted to seek an insolvent insurer's share on a pro rata basis from the solvent insurers on the claim. There is, however, no language in § 31-299b to support that contention. Indeed, in light of our construction of the guaranty act in *Doucette*, under which a self-insurer is not an "insurer" excluded from coverage under § 38a-838 (5), there is no evidence beyond § 31-299b from which we could conclude that the legislature intended self-insurers to seek reimbursement from solvent insurers.[14] Accordingly, we conclude that a self-insured employer may seek reimbursement from the association for an insolvent insurer's apportioned share of a workers' compensation claim.

## II

The association also contends that, even if we conclude that Simkins, as a self-insured employer, may obtain reimbursement from the association for an insolvent insurance carrier's share of workers' compensation benefits, Simkins cannot do so in the present case

[14] In this regard, the defendant relies on the board's holding in *Konovaluk* v. *Graphite Die Mold, Inc.*, No. 4437 CRB-3-01-9 (August 8, 2002), wherein the board had concluded that an insurer that was unable to seek reimbursement of an insolvent insurer's share from the association could seek reimbursement on a pro rata basis from the other solvent insurers. We agree with the board that the present case is distinguishable from *Konovaluk* in light of Simkins' status as a self-insurer, which entitles it to seek reimbursement from the association. We therefore express no opinion on the holding in *Konovaluk*, and the issue decided therein remains an open question. See *Hunnihan* v. *Mattatuck Mfg. Co.*, supra, 243 Conn. 454 ("[w]e express no opinion . . . as to whether the last insurer may seek reapportionment among the remaining solvent insurers by the commission when a prior insurer has been adjudicated insolvent, because that decision is not necessary to the resolution of this appeal").

because it has not exhausted its remedies as required under General Statutes § 38a-845 (1).[15] The association contends that Simkins was required to seek reimbursement from all the solvent insurers for their proportional shares of benefits attributable to their periods of coverage, *and* for a similarly proportional share of any benefits that were due from American Mutual. In other words, the association contends that Simkins would have to seek reapportionment or redistribution of the insolvent carrier's share among the remaining solvent insurers on the claim before seeking reimbursement from the association. We disagree.

In addition to our conclusion in part I of this opinion that § 31-299b provides no right to apportionment, we note that § 38a-845 imposes no exhaustion obligation in the present case because Simkins has no rights under an insurance policy with any of the insurers that were not already satisfied. See footnote 5 of this opinion. The record reflects that those policies provided coverage to Simkins as an insured for its workers' compensation claims for insurers that fully honored their obligations under their respective policies. See *Giglio* v. *American Economy Ins. Co.*, supra, 278 Conn. 814 ("[t]he exhaustion requirement applies only when there is a valid claim against another insurance company"); *Robinson* v. *Gailno*, 275 Conn. 290, 306, 880 A.2d 127 (2005) ("a claimant satisfies the exhaustion requirement of § 38a-845 [1] by pursuing coverage under her own uninsured motorist policy prior to attempting to collect either from the [state] guaranty fund or the tortfeasor personally"). The legislative objective of the guaranty act was

---

[15] General Statutes § 38a-845 (1) provides: "Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of an insolvent insurer, which is also a covered claim under sections 38a-836 to 38a-853, inclusive, shall exhaust first his rights under such policy. Any amount payable on a covered claim under said sections shall be reduced by the amount recoverable under the claimant's insurance policy or chapter 568."

to make the association liable to the same extent that the insolvent insurer would have been liable under its policy. *Connecticut Ins. Guaranty Assn.* v. *Union Carbide Corp.*, supra, 217 Conn. 390 (association may not use exhaustion or nonduplication of recovery provisions to avoid responsibilities for paying claims that should have been covered by insolvent excess insurer). Accordingly, there is no exhaustion of remedies bar to Simkins seeking recovery against the association.

The decision of the board is affirmed.

In this opinion the other justices concurred.