DENNIS MARROQUIN *v.* F. MONARCA
MASONRY ET AL.
(AC 30692)

Flynn, C. J., and Robinson and Sullivan, Js.*

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued October 26, 2009—officially released June 1, 2010

*David A. Kelly*, for the appellant (defendant MRI Construction, Inc.).

*Timothy G. Zych*, for the appellees (named defendant et al.).

*Opinion*

FLYNN, C. J. This workers' compensation appeal arises out of a dispute between two employers, F. Monarca Masonry (Monarca) and MRI Construction, Inc. (MRI), both defendants in this case,[1] as to which of them is responsible for surgical and indemnity benefits arising from two surgical procedures that the nonappearing plaintiff, Dennis Marroquin, (claimant) underwent after experiencing severe pain on September 20, 2004. MRI appeals from the decision of the workers' compensation review board (board) affirming the findings and conclusion of the workers' compensation commissioner (commissioner), in which the commissioner found that the claimant's surgeries on October 15, 2004, and June 10, 2005, were related to an earlier injury he suffered on June 21, 2001, while he was employed by MRI and were not related to an alleged new injury sustained on September 20, 2004, while he was employed by Monarca. In accordance with these findings, the commissioner ordered MRI to reimburse Monarca $51,535 for medical and indemnity benefits that it had paid on behalf of the claimant. On appeal, MRI claims that the board improperly affirmed the decision of the commissioner: (1) ordering MRI to reimburse Monarca for moneys that it had paid to, or on behalf of, the claimant when the commissioner was without statutory authority or subject matter jurisdiction to make such an order and (2) that no second

---

[1] Eastern Casualty Insurance Company, the workers' compensation liability insurer for MRI, and Travelers Indemnity Company, the workers' compensation insurer for Monarca, also are parties to this action. For convenience, we refer to each employer and its insurer by the employer's name unless otherwise necessary.

injury had occurred to the claimant on September 20, 2004. We affirm the decision of the board.

The following facts are not in dispute. On June 21, 2001, the claimant suffered an inguinal hernia in his left groin while employed by MRI. He underwent surgery to repair the hernia, wherein surgical mesh was used to reinforce the injured area. This injury was work related, and the claim was administered by Eastern Casualty Insurance Company (Eastern), MRI's workers' compensation insurance carrier. On September 20, 2004, the claimant, while working for Monarca, was standing on scaffolding as he turned his body in an awkward manner while attempting to retrieve some cinder blocks, each weighing approximately thirty-seven pounds, from overhead. When attempting to get the third block, the claimant felt a pop in his groin and experienced sharp pain. Upon investigation of the groin area, the claimant found a large bulge, which he showed to his supervisor who told him to seek immediate medical attention. The claimant went to St. Vincent's Immediate Health Care Clinic and then to St. Vincent's Hospital, where he was admitted and treated nonsurgically. His diagnosis was acute diverticulitis and a possible hernia in the left groin. The claimant was discharged from the hospital three days later and was referred to the surgical clinic for further treatment.

On October 15, 2004, Vincent P. Donnelly, a surgeon at St. Vincent's Medical Center, performed a surgical exploration of the left inguinal area where he discovered marked inflammation and hard scar tissue. He also discovered that the mesh that had been used in the 2001 hernia surgery had migrated out of the inguinal region. Dr. Donnelly, however, did not find a recurrent or a new hernia. After thoroughly exploring the groin area and removing as much of the mesh as he could during this procedure, he ended the surgery, and the claimant was discharged from the hospital later that

day. Dr. Donnelly opined that, although the claimant said he first felt the bulge after lifting the cinder block on September 20, 2004, he likely had had the bulge for some time prior to that date.

On October 18, 2004, the claimant returned to St. Vincent's Hospital with an infected wound, which was treated, and antibiotics were prescribed for him. The claimant continued to go to St. Vincent's Surgical Clinic for treatment of pain and for drainage of his infected wound through December, 2004. Dr. Donnelly suggested further surgery to remove the remaining mesh, and, on June 10, 2005, Dr. Donnelly performed a second surgery to remove the remaining mesh, which was infected, and to repair a perforation of the colon, apparently caused by the mesh. Dr. Donnelly testified, and the commissioner found, that "the mesh plug from the first injury caused the fistula from the colon into the mesh in the groin, which caused the chronic infection, and the presence of the diverticulosis was incidental." As a result of the claimant's surgeries, Monarca and its insurer, Travelers Indemnity Company, paid $51,535 in medical and indemnity benefits associated with the claimant's workers' compensation claim.

On January 9, 2006, Monarca filed a request for an informal hearing before the commissioner seeking reimbursement from MRI for moneys it had expended on behalf of the claimant; a preformal hearing request and a formal hearing request followed on January 9, 2006, and July 9, 2007, respectively. The issue, as set forth by the commissioner in her November 26, 2007 finding and award, was "[w]hether Eastern . . . is obligated to reimburse . . . Travelers for medical and indemnity benefits arising from the October 15, 2004 and June 10, 2005 surgeries under General Statutes § 31-299b."

In her written decision, the commissioner found that "the claimant did not sustain a new inguinal hernia as

a result of the September 20, 2004 lifting incident" and that the cause of the bulge or mass found in the claimant's groin was due to the mesh put in place during the claimant's prior hernia surgery on June 21, 2001. Specifically, she explained that "the mesh plug from the 2001 surgery caused the fistula from the colon into the mesh in the groin which caused the chronic infection, and that the presence of the diverticulosis was incidental. Thus . . . the mesh plug from the 2001 hernia surgery caused the fistula from the colon into the mesh in the groin which caused the infection and the subsequent need for the October 15, 2004 surgery." She concluded that this also caused the need for the additional surgery on June 10, 2005. The commissioner did not find persuasive Dr. Donnelly's opinion that the claimant's infection arose out of the September 20, 2004 lifting incident. Rather, she found that the infection, the fistula and the mass, which resulted in the need for the surgeries performed by Dr. Donnelly, were caused by the mesh put in place during the 2001 surgery and, thus, that the claim for benefits was the responsibility of MRI and its insurer, Eastern. The commissioner then ordered MRI and Eastern to reimburse to Monarca and its insurer, Travelers Indemnity Company, the sum of $51,535, which they had paid on the claimant's behalf. MRI thereafter filed a motion to correct the finding and award, which the commissioner denied.

MRI appealed to the board from the commissioner's denial of the motion to correct and from her finding and award. On December 19, 2008, the board affirmed the decisions of the commissioner. This appeal followed.

I

MRI claims that "there exists no subject matter jurisdiction or statutory authority under General Statutes § 31-299b, or any other provision of the Connecticut

Workers' Compensation Act [act], General Statutes § 31-275 et seq., permitting a [c]ommissioner to order one employer/carrier to reimburse another employer/carrier for benefits that the later employer/carrier has already accepted as compensable and paid to the [c]laimant in connection with a recurrent injury." We conclude that the commissioner had both subject matter jurisdiction over the case and the authority to order MRI to reimburse Monarca for moneys it expended on the claimant's behalf.[2]

"Jurisdiction of the subject-matter is the power . . . to hear and determine cases of the general class to which the proceedings in question belong. . . . A court has subject matter jurisdiction if it has the authority to adjudicate a particular type of legal controversy. . . . This concept, however, is not limited to courts. Administrative agencies . . . are tribunals of limited jurisdiction and their jurisdiction is dependent entirely upon the validity of the statutes vesting them with power . . . . As our Supreme Court has explained, certain jurisdictional facts are essential to establish the statutory jurisdiction of tribunals of limited authority. The existence of these facts is fundamental to the power to entertain and adjudicate a proceeding on the merits. In short, such facts condition the power to act." (Citation omitted; internal quotation marks omitted.) *Dept. of Public Safety* v. *Freedom of Information Commission*, 103 Conn. App. 571, 576–77, 930 A.2d 739, cert. denied,

---

[2] In the workers' compensation forum, MRI did not challenge either the commissioner's subject matter jurisdiction or her authority to order reimbursement. It has raised both issues for the first time on appeal. We address the question of subject matter jurisdiction because if the tribunal from which an appeal has been taken improperly asserted jurisdiction, we are barred from hearing the merits of the appeal. See *Connecticut Bank & Trust Co.* v. *Commission on Human Rights & Opportunities*, 202 Conn. 150, 520 A.2d 186 (1987). We address the issue of the commissioner's authority in order to put to rest any related question about the commissioner's power under the circumstances of this case.

284 Conn. 930, 934 A.2d 245 (2007). Furthermore, once subject matter jurisdiction is questioned, the jurisdictional question generally must be resolved before the substantive issues of the appeal are addressed. See *Conboy* v. *State*, 292 Conn. 642, 652–53, 974 A.2d 669 (2009). "[A] determination regarding [an agency's] subject matter jurisdiction is a question of law . . . ." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *Freedom of Information Commission*, supra, 576.

In the present case, MRI contends that the commissioner did not have subject matter jurisdiction to order MRI to reimburse Monarca. MRI does not argue that the commissioner could not hear the case, only that she could not enter the order that she entered. We conclude that such a claim relates to the authority of the commissioner, not to the jurisdiction of the commissioner, and we further conclude that the commissioner had subject matter jurisdiction over the case.

"The primary statutory provision establishing the subject matter jurisdiction of the commissioner is General Statutes . . . § 31-278.[3] [That statute] provides in relevant part that each commissioner shall have all powers necessary to enable [such commissioner] to perform the duties imposed . . . by the provisions of [the act]. . . . [*Each commissioner*] *shall have jurisdiction of*

---

[3] General Statutes § 31-278 provides in relevant part: "Each commissioner shall, for the purposes of this chapter, have power to summon and examine under oath such witnesses, and may direct the production of, and examine or cause to be produced or examined, such books, records, vouchers, memoranda, documents, letters, contracts or other papers in relation to any matter at issue as he may find proper, and shall have the same powers in reference thereto as are vested in magistrates taking depositions and shall have the power to order depositions pursuant to section 52-148. He shall have power to certify to official acts and shall have all powers necessary to enable him to perform the duties imposed upon him by the provisions of this chapter. Each commissioner shall hear all claims and questions arising under this chapter in the district to which the commissioner is assigned and all such claims shall be filed in the district in which the claim arises . . . ."

*all claims and questions arising . . . under [the act]
. . . ."* (Citation omitted; internal quotation marks omitted.) *Del Toro* v. *Stamford*, 270 Conn. 532, 540–41, 853 A.2d 95 (2004).

General Statutes § 31-278 clearly provides that each commissioner has jurisdiction of all claims and questions arising under the act. A question as to whether the claimant suffered from a new injury, a recurrent injury or something else, along with a question of which employer(s) would be responsible for compensation and in what proportion are claims and questions arising under the act. Pursuant to § 31-299b, "[i]f an employee suffers an injury or disease for which compensation is found by the commissioner to be payable according to the provisions of this chapter, the employer who last employed the claimant prior to the filing of the claim, or the employer's insurer, shall be initially liable for the payment of such compensation. The commissioner shall, within a reasonable period of time after issuing an award, on the basis of the record of the hearing, determine whether prior employers, or their insurers, are liable for a portion of such compensation and the extent of their liability. If prior employers are found to be so liable, the commissioner shall order such employers or their insurers to reimburse the initially liable employer or insurer according to the proportion of their liability. . . ."

In the present case, the commissioner was called on to determine whether the claimant's September 20, 2004 incident and subsequent surgeries were related to a new injury or to the claimant's previous injury. She also was called on to assess the proportional liability of the claimant's employers, current and former, for the September 20, 2004 incident and subsequent surgeries. Under the wording of § 31-299b, the commissioner has the jurisdiction to "determine whether prior employers,

or their insurers, are liable for a portion of [the claimant's] compensation and the extent of their liability. . . ." General Statutes § 31-299b. On the basis of this clear language, we conclude that the commissioner had subject matter jurisdiction over this case. The issue of whether the commissioner had the authority to order reimbursement on the facts of this case, however, is a little more complicated.

MRI argues that pursuant to our Supreme Court's construction of § 31-299b in *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 313, 819 A.2d 260 (2003), the commissioner only has the authority to order reimbursement for claims "involving occupational disease and repetitive trauma . . . [and] . . . the [c]ommissioner made no finding that this claim involved an occupational disease or [a] repetitive trauma." We are not persuaded.

At the outset, we set forth the applicable standard of review. Because this claim presents an issue of statutory interpretation, our review is plenary. See *Esposito* v. *Simkins Industries, Inc.*, 286 Conn. 319, 326, 943 A.2d 456 (2008). Claims "that present pure questions of law . . . invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Internal quotation marks omitted.) Id.

Although § 31-299b previously has been subjected to judicial scrutiny in *Hatt*, neither this court nor our

Supreme Court ever has considered whether that interpretation applies in the context of a claimant suffering a recurrent injury while employed by a subsequent employer. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply." (Internal quotation marks omitted.) Id., 327.

Relying on our Supreme Court's interpretation of § 31-299b in *Hatt*, MRI argues that the commissioner only has the authority to order reimbursement in cases of repetitive trauma and occupational disease. We conclude that *Hatt* does not control under the facts of this case. In *Hatt*, the claimant had suffered two distinct injuries to her left foot while working for the same employer; the employer, however, had changed insurance carriers during the time between the claimant's first and second injuries. *Hatt* v. *Burlington Coat Factory*, supra, 263 Conn. 285. One of the questions before the Supreme Court was whether, in the case of two distinct injuries, both of which occurred while the claimant was working for the same employer, there could be apportionment between the two insurers whose coverage did not overlap when both injuries involved the same foot. Id., 280–83. The court held that apportionment was not appropriate when there was a second distinct injury and that the second employer or insurer retained sole liability for the second injury. Id., 308. The second insurer had argued that apportionment was possible either under the common law or under § 31-299b. Id., 282–83. Our Supreme Court evaluated the interplay between § 31-299b and General Statutes § 31-349. In § 31-349, the legislature, in part, closed the second injury fund to new claims and required the

insurer at the time of the second injury to retain sole liability for a claimant's new injury. See id., 308. "[I]n § 31-299b, the legislature explicitly provided for an apportionment scheme in the single injury and multiple employer or insurer scenario." Id., 311. Accordingly, the Supreme Court held that apportionment was not available to a second employer or insurer when a second distinct injury occurs. See id., 312.

In reviewing *Hatt*, we agree with MRI that the court used very strong language in stating that "§ 31-299b is applicable only to single instances of occupational disease or repetitive trauma . . . ." Id., 317. The case, however, concerned a second insurer that was seeking apportionment when the claimant had two *separate and distinct* injuries to the same body part, and the board had held the second insurer solely liable. Id., 287. The case did not concern a single injury that had resultant complications of sorts years later. Therefore, although *Hatt* is useful to our analysis, it is not completely on point, and we conclude that the court's statement that the apportionment permissible pursuant to § 31-299b "is applicable only to single instances of occupational disease or repetitive trauma"; id., 317; is not controlling under the markedly different facts of the present case.

Rather than the case the Supreme Court was presented with in *Hatt*, namely, successive insurers for the same employer and a claimant with two separate and distinct injuries, each of which was suffered during a different insurer's policy coverage, we are presented with multiple insurers and a claimant with a single injury. We do find highly significant the Supreme Court's statement in *Hatt* that in enacting § 31-299b, "the legislature explicitly provided for an apportionment scheme in the single injury and multiple employer or insurer scenario"; id., 311; and we conclude that under § 31-299b, the commissioner had the authority

to apportion liability to the responsible employer-insurer in this "single injury and multiple employer or insurer scenario." Id.

Section 31-299b provides in relevant part: "If an employee suffers an injury or disease for which compensation is found by the commissioner to be payable according to the provisions of this chapter, the employer who last employed the claimant prior to the filing of the claim, or the employer's insurer, shall be initially liable for the payment of such compensation. The commissioner shall, within a reasonable period of time after issuing an award, on the basis of the record of the hearing, determine whether prior employers, or their insurers, are liable for a portion of such compensation and the extent of their liability. If prior employers are found to be so liable, the commissioner shall order such employers or their insurers to reimburse the initially liable employer or insurer according to the proportion of their liability. . . ."

In this case, the commissioner found that the claimant's June 21, 2001 injury was the cause of the September 20, 2004 incident and related need for surgeries, and that there was not a new injury involved. In accordance with § 31-299b, Monarca, as "the employer who last employed the claimant prior to the filing of the claim, or the employer's insurer"; General Statutes § 31-299b; initially was liable for the payment of such compensation. It then sought, again in accordance with § 31-299b, for the commissioner to "determine whether prior employers, or their insurers, [were] liable for a portion of such compensation and the extent of their liability. . . ." General Statutes § 31-299b. Until the commissioner made her factual findings, neither employer-insurer knew who the commissioner ultimately would find responsible for the claimant's compensation or whether this was a second injury, a recurrence of the first injury or something else. Once the commissioner

made her findings and concluded that the claimant had not suffered a new injury but had suffered complications from the first injury, the commissioner had the authority, pursuant to § 31-299b, to order the former employer-insurer to reimburse the present employer-insurer.

## II

MRI also claims that the board improperly affirmed the decision of the commissioner concluding that no second injury had occurred to the claimant on September 20, 2004. Specifically, MRI argues that the decision of the board, affirming the commissioner's decisions, must be reversed because "(1) it is incorrect in law; (2) it includes facts found without evidence; and (3) it fails to include evidentiary facts that were uncontradicted." We are not persuaded.

In reviewing MRI's claim, we employ the following standard of review. "A party aggrieved by a commissioner's decision to grant or deny an award may appeal to the board pursuant to General Statutes § 31-301. The board is obliged to hear the appeal on the record and not retry the facts. . . . [T]he power and duty of determining the facts rests on the commissioner, the trier of facts. . . . The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . Our scope of review of the actions of the board is similarly limited. . . . The role of this court is to determine whether the . . . [board's] decision results from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them." (Internal quotation marks omitted.) *McFarland* v. *Dept. of Developmental Services*, 115 Conn. App. 306, 310–11, 971 A.2d 853, cert. denied, 293 Conn. 919, 979 A.2d 490 (2009).

MRI claims that the board improperly upheld the decision of the commissioner, which it claims was incorrect in law in that "it contravenes General Statutes § 31-349 and this court's holding in *Epps* v. *Beiersdorf, Inc.*, 41 Conn. App. 430, [675 A.2d 1377 (1996)]." MRI argues that "the employer/insurer at the time of the second injury retains sole liability for a claimant's second injury and may not seek apportionment as against a previous employer." MRI further argues that the medical evidence was uncontradicted that "the claimant suffered an 'aggravation' of his June 21, 2001 injury, which under *Epps* v. *Beiersdorf, Inc.*, [supra, 430], required the [c]ommissioner to conclude that the claimant suffered a second 'injury' and, therefore, [Monarca-Travelers] remained solely liable for the claimant's injury as the employer/insurer at the time of the second injury." We are not persuaded.

In *Epps*, this court reversed the decision of the board upholding the commissioner's decision that the claimant's workplace exposure to chemicals was not an aggravating factor or substantial causal factor that worsened his preexisting respiratory condition. *Epps* v. *Beiersdorf, Inc.*, supra, 41 Conn. App. 431. The claimant in *Epps* had respiratory problems that were aggravated by his exposure to workplace chemicals, although the problems were not caused by this exposure. Id., 432. The commissioner concluded that the claimant had not proven that his condition was caused by his workplace exposure to chemicals, and this decision was upheld by the board.

In reversing the board's decision on appeal, we explained that "the record contain[ed] no evidence on which the commissioner could have reasonably relied in determining that the [claimant's] exposure to chemicals while employed as a compounder did not aggravate his

preexisting respiratory condition." Id., 434. Furthermore, "[o]ur review of the record reveal[ed] uncontradicted medical testimony indicating that the [claimant's] constant workplace exposure to chemicals aggravated his respiratory condition." Id., 435.

The commissioner in the *Epps* case had interpreted the medical testimony to support the conclusion that the plaintiff's exposure only irritated, but did not aggravate, his preexisting respiratory problems. Id., 433–34. We explained that "[t]his interpretation, however, overlook[ed] a fundamental tenet of workers' compensation law, namely that an employer takes the employee in the state of health in which it finds the employee." Id., 435. We also placed much emphasis on the uncontradicted medical testimony that "used the word 'aggravating' and not 'irritating' " in explaining the interplay between the claimant's workplace exposure to chemicals and recurrent respiratory problems. Id.

MRI argues that the present case is similar to *Epps* in that the uncontradicted medical testimony was that the claimant's earlier injury was " 'aggravated' by the September 20, 2004 lifting incident . . . [and that therefore] the only legally appropriate conclusion that the [c]ommissioner could [have] reach[ed] was that the 'aggravation' suffered by the [c]laimant constituted a second 'injury' and, therefore, that [Monarca-Travelers] remained solely liable for the benefits paid subsequent to the September 20, 2004 lifting incident pursuant to § 31-349."

Monarca argues that the testimony and reports clearly show that the claimant did not sustain a new injury on September 20, 2004, and that Dr. Donnelly's use of the word "aggravated" was speculative. Monarca argues that Dr. Donnelly specifically stated that he merely was assuming that the lifting incident on September 20, 2004, was related to the claimant's need for

surgery and that Dr. Donnelly also admitted that he could not explain how the lifting incident was related to the infection that arose in the claimant but that he assumed that they must have been related. Monarca argues that this clearly demonstrates that Dr. Donnelly merely was speculating that the lifting incident and the need for surgery were related and that the commissioner properly discounted this testimony because it was not based on a reasonable medical probability and that the board properly upheld the commissioner's decision. We agree.

The relevant testimony by Dr. Donnelly was as follows:

"[The Witness]: Perhaps the explanation for [the claimant's] sudden pain [in his groin on September 20, 2004] would be that that was the moment that the leak started to occur from the colon into the mesh and into the groin, giving him an acute inflammatory reaction there. That's supposition; I don't have any way to explain it.

"Q. Well, the commissioner's standard is reasonable medical probability, and they would like you to be more than 50 percent sure of any opinion you are giving. Is it your opinion that it was 50 percent or more?

"A. My feeling is . . . if he did not have the mesh placed in his groin and get a fistula from the colon to the mesh that he might have had trouble with his diverticulum when he got to be sixty or seventy years of age, but he probably would not have it at that time.

"Q. And this reaching and straining and pulling activity he did that brought this—possibly brought this condition more to prominence at the time?

"A. I would say possibly. I would say probably, because he did not have the pain before that, and the

pain and the mass occurred basically at the same time and were related to that fistula.

"Q. So is it fair to state that . . . this reaching and straining and lifting the cinder block . . . would have hastened the onset of him discovering this condition? Or how would you characterize it?

"A. I would think that, yeah.

"Q. Did it aggravate his condition, this lifting and stretching?

"A. Yes."

Immediately thereafter, on cross-examination, the following colloquy occurred:

"Q. Aggravated how, doctor?

"A. Well, he did not have the pain and . . . swelling before he lifted those things . . . and he had them after. He had the pain and swelling afterward. So, I would assume that the lifting in some way is related to the mass and the subsequent demonstration of fistula.

"Q. Was that confirmed on operation of the mass, that there was not aggravation by that lifting, or was it just the pain increase?

"A. There was a lot of inflammation around the mesh and the groin at the first operation we did. From his history, I would assume that started ten days before, and it brought him to the emergency room.

"Q. But the condition you found on operation, was that caused by the lifting incident, the scar tissue and the mass around the mesh and the condition of the mesh to the colon?

"A. I think scar tissue around the mass—the mesh has probably been there for quite a while. The infection or inflammation of that probably was the inciting factor

that caused the acute pain and maybe increased the swelling because infection is one of the cardinal symptoms of infection is swelling.

"Q. So, you believe that an infection arose as a result of the September 20 incident?

"A. Yes. I cannot really explain how, but, yes, I think it must have.

"Q. You could say that within reasonable medical probability?

"A. Yes."

In her findings and award, the commissioner specifically stated that she did not "find Dr. Donnelly's testimony persuasive in that he believed that an infection arose as a result of the September 20, 2004 incident." She then, "on the [basis of the] totality of the evidence submitted," specially found that "the insertion of the mesh plug from the 2001 surgery led to the fistula, colon infection, and inguinal mass, and subsequent need for hospitalization and surgeries." The board affirmed the commissioner's decision, concluding that the record did not demonstrate a new injury. Specifically, the board explained: "We appreciate that several issues in this matter were not completely resolved by the evidence presented. For instance, Dr. Donnelly could not explain what may have accounted for the 'popping' sensation experienced by the claimant at the time of the September 20, 2004 [incident]. Nor could the doctor explain the claimant's insistence that he did not notice [that] he had a bulge in his groin until after the lifting incident . . . rather, the doctor theorized that the claimant had probably had the bulge for some time and simply did not realize it. In fact, Dr. Donnelly persisted in that explanation, even when pressed by counsel. Finally, the doctor's testimony regarding the genesis of the claimant's infection was vague and inconclusive, and we

affirm the commissioner's decision to disregard the doctor's testimony on this point. However, the fact that these issues were not resolved to [MRI's] satisfaction does not significantly detract from the overall tenor of Dr. Donnelly's testimony or the thrust of the operative reports in terms of supporting the commissioner's determination regarding the relationship between the lifting incident of September 20, 2004, and the claimant's surgeries in October, 2004, and June, 2005."

MRI makes much of the fact that Dr. Donnelly used the word aggravate or aggravation to support its claim that the September 20, 2004 lifting incident caused a new injury. We agree, however, with the statement set forth in *Orlando* v. *Reliable Construction Services*, No. 4791 CRB-8-04-3 (April 6, 2005), that "it is not a mere increase in pain or symptoms that triggers a finding of a new injury or aggravation within the meaning of the [act]. Some finding that subsequent work exposures have contributed to a claimant's condition must also be present."

In the present case, we simply cannot agree that the mere use of the word "aggravate" under these circumstances demonstrated a causal relationship between the need for the two surgeries and the lifting incident. "Whether an expert's testimony is expressed in terms of a reasonable probability that an event has occurred does not depend [on] the semantics of the expert or his use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony." *Struckman* v. *Burns*, 205 Conn. 542, 555, 534 A.2d 888 (1987). The record here simply does not demonstrate that the lifting incident contributed to the claimant's need for surgery in 2004 and 2005. We agree with the commissioner and the board that the record as a whole supports the conclusion that the claimant's need for the 2004 and 2005 surgeries was caused by the insertion of the mesh plug in the 2001

surgery, which, after migrating out of the inguinal region, led to the fistula, colon infection and inguinal mass.

The decision of the workers' compensation review board is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.