## JAMES POTVIN *v.* LINCOLN SERVICE AND EQUIPMENT COMPANY ET AL.
### (SC 18357)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille,
Zarella and McLachlan, Js.*

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued March 17—officially released October 19, 2010

*Mark D. Robins*, pro hac vice, with whom was *Frank A. May*, for the appellant (defendant Guaranty Fund Management Services).

*Joshua A. Hawks-Ladds*, with whom, on the brief, was *Christine Collyer*, for the appellee (plaintiff).

Opinion

ZARELLA, J. The defendant Guaranty Fund Management Services[1] appeals[2] from the decision of the compensation review board (board), which upheld the decision of the workers' compensation commissioner for the third district (commissioner) imposing sanctions against the Connecticut Insurance Guaranty Association (association)[3] pursuant to General Statutes (Rev. to 2005) § 31-288 (b)[4] and ordering the association to pay attorney's fees[5] pursuant to General Statutes § 31-

[1] The named defendant, Lincoln Service and Equipment Company, is not a party to this appeal. In the interest of simplicity, we refer to the defendant Guaranty Fund Management Services as the defendant throughout this opinion.

[2] The defendant appealed from the decision of the compensation review board to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] The defendant manages several insurance guaranty funds, including the association, and represents the interests of the association in the present case.

[4] General Statutes (Rev. to 2005) § 31-288 (b) provides in relevant part: "Whenever (1) through the fault or neglect of an employer or insurer, the adjustment or payment of compensation due under this chapter is unduly delayed . . . the delaying party or parties may be assessed a civil penalty of not more than five hundred dollars by the commissioner hearing the claim for each such case of delay. . . ."

All references throughout this opinion to § 31-288 are to the 2005 revision.

[5] We sometimes refer collectively to the sanctions and attorney's fees as sanctions.

$300^6$ for undue delay in processing a claim by the plaintiff, James Potvin, on behalf of an insolvent insurer pursuant to the Workers' Compensation Act, General Statutes § 31-275 et seq., and the Connecticut Insurance Guaranty Association Act (guaranty act), General Statutes § 38a-836 et seq. The board concluded that the commissioner had the authority to impose sanctions against the association, that the sanctions were part of a "covered claim" under General Statutes § 38a-838 (5),[7] which the association is obligated to pay in accordance with General Statutes § 38a-841 (1) (a) and (b),[8] and

[6] General Statutes § 31-300 provides in relevant part: "In cases where, through the fault or neglect of the employer or insurer, adjustments of compensation have been unduly delayed, or where through such fault or neglect, payments have been unduly delayed, the commissioner may include in the award interest at the rate prescribed in section 37-3a and a reasonable attorney's fee in the case of undue delay in adjustments of compensation and may include in the award in the case of undue delay in payments of compensation, interest at twelve per cent per annum and a reasonable attorney's fee. . . ."

[7] General Statutes § 38a-838 provides in relevant part: "(5) 'Covered claim' means an unpaid claim, including, but not limited to, one for unearned premiums, which arises out of and is within the coverage and subject to the applicable limits of an insurance policy to which sections 38a-836 to 38a-853, inclusive, apply issued by an insurer, if such insurer becomes an insolvent insurer after October 1, 1971, and (A) the claimant or insured is a resident of this state at the time of the insured event; or (B) the claim is a first party claim for damage to property with a permanent location in this state . . . ."

[8] General Statutes § 38a-841 (1) provides in relevant part: "[The] [a]ssociation shall: (a) Be obligated to the extent of the covered claims existing prior to the determination of insolvency and arising within thirty days after the determination of insolvency, or before the policy expiration date if less than thirty days after the determination, or before the insured replaces the policy or causes its cancellation, if he does so within thirty days of such determination, provided such obligation shall be limited as follows: (i) With respect to covered claims for unearned premiums, to one-half of the unearned premium on any policy, subject to a maximum of two thousand dollars per policy; (ii) with respect to covered claims other than for unearned premiums, such obligation shall include only that amount of each such claim which is in excess of one hundred dollars and is less than three hundred thousand dollars for claims arising under policies of insurers determined to be insolvent prior to October 1, 2007 . . . except that said association shall pay the full amount of any such claim arising out of a workers' compensation

that the association is not immune from sanctions by virtue of General Statutes § 38a-850.[9] The defendant claims that the board improperly determined that the commissioner has the authority to impose sanctions on the association and specifically argues that the board improperly (1) applied the Appellate Court's decision in *Pantanella* v. *Enfield Ford, Inc.*, 65 Conn. App. 46, 53, 782 A.2d 141, cert. denied, 258 Conn. 930, 783 A.2d 1029 (2001), to the facts of the present case, and (2) determined that the association is obligated to pay the sanctions because § 38a-850 provides a broad grant of immunity to the association, including immunity from sanctions, the sanctions imposed are not part of a "covered claim" within the meaning of § 38a-838 (5), and the association cannot be "deemed the insurer" under § 38a-841 (1) (b). The plaintiff responds that the board properly upheld the imposition of sanctions.[10] We agree

policy, provided in no event shall (A) said association be obligated to any claimant in an amount in excess of the obligation of the insolvent insurer under the policy form or coverage from which the claim arises, or (B) said association be obligated for any claim filed with the association after the expiration of two years from the date of the declaration of insolvency unless such claim arose out of a workers' compensation policy and was timely filed in accordance with section 31-294c; (b) be deemed the insurer to the extent of its obligations on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent . . . ."

Although § 38a-841 (1) was amended in 2007; see Public Acts 2007, No. 07-21, § 1; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 38a-841.

[9] General Statutes § 38a-850 provides: "There shall be no liability on the part of and no cause of action of any nature shall arise against any member insurer, said association or its agents or employees, the board of directors, or any person serving as an alternate or substitute representative of any director or the commissioner or his representatives for any action taken or any failure to act by them in the performance of their powers and duties under sections 38a-836 to 38a-853, inclusive."

[10] In his brief, the plaintiff also raises an alternative ground for affirming the board's decision. Specifically, the plaintiff relies on article first, § 10, of the constitution of Connecticut, which provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." The plaintiff asserts that, if the

with the defendant that the association is statutorily immune from the sanctions imposed in the present case and that the sanctions are not part of a "covered claim" within the meaning of § 38a-838 (5). Accordingly, we reverse the decision of the board.

The board found the following undisputed facts relevant to this appeal. "The [plaintiff] suffered a compensable injury in 2000, which was accepted by his employer, Lincoln Service and Equipment [Company], in 2001. At that time, a voluntary agreement was approved by the [workers' compensation] commission. The [plaintiff] had a knee replacement surgery performed in 2003 but, following the procedure, continued to complain of knee pain. [The association's] umbrella organization, [the defendant],[11] had the [plaintiff] examined by . . . MacEllis Glass [a physician] on January 12, 2005. . . . Glass strongly recommended that the [plaintiff] be

association is not required to pay the sanctions in the present case, he will be left without a remedy in violation of his rights under article first, § 10. The plaintiff's brief discussion of this claim is limited to the text of the constitutional provision, one citation to a case of limited relevance, and a limited, conclusory analysis. Additionally, the plaintiff did not provide any analysis of the factors set forth in this court's decision in *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992). We conclude that the plaintiff did not provide an adequate analysis of his constitutional claim, and, therefore, we decline to review it. See, e.g., *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120–21, 830 A.2d 1121 (2003) (upholding trial court's decision not to address constitutional claim when party provided only text of provision and two citations not specifically relating to issue before court). Even if we were to address this claim, we note that the plaintiff's argument would be unlikely to succeed. As we discuss in part I A 2 of this opinion, the plaintiff is afforded a remedy, it is just not the remedy that he seeks. Additionally, to the extent that the plaintiff asserts a constitutional right to attorney's fees, it is doubtful that article first, § 10, provides such a right. See *Doe* v. *State*, 216 Conn. 85, 106, 579 A.2d 37 (1990) (concluding that article first, § 10, provides no independent right to attorney's fees).

[11] The defendant assumed the handling of the claim involved in the present case on behalf of the association pursuant to the provisions of the guaranty act when the workers' compensation insurer of the plaintiff's employer became insolvent.

examined by another physician for consideration of a patellar replacement. [The defendant] authorized the [plaintiff] to be examined by a second [physician], [namely] John Grady-Benson, who noted an antalgic limp and recommended a bone scan of the patella. He also recommended [a magnetic resonance image (MRI)] of the [plaintiff's] lower spine to determine if he had a neurological disorder due to the right knee replacement. . . . Grady-Benson examined the [plaintiff] on April 6, 2005, and submitted a bill in the amount of $343 for the examination.

"[Although] this bill was properly submitted to [the defendant], it was not paid until September 15, 2005. During this period, an adjuster for [the defendant], Kristen Rogers, prepared an authorization for the [plaintiff's] MRI but decided not to issue the authorization, claiming [that] 'she [had] realized the back injury was not part of the compensable injury.' . . . Rogers claimed she orally authorized the bone scan in August, 2005. Counsel for [the defendant] offered to pay for the bone scan on September 1, 2005, on a 'without prejudice' basis but demurred on the issue of the MRI. Following an informal hearing before [the] commissioner . . . on February 15, 2006, [the defendant] finally provided written authorization for the bone scan and [the] MRI.

"Following [the defendant's authorization of] these medical tests, the [plaintiff] encountered numerous difficulties in getting [the defendant] to guarantee payment to Hartford Hospital for these tests. The [plaintiff] presented himself twice for the tests, both on July 10, 2006, and July 11, 2006, and both times Hartford Hospital declined to perform the tests due to inadequate assurances of payment. The [plaintiff] then had the tests [covered by] private group insurance for which a $100

co-pay was assessed.[12] . . . Seven workers' compensation hearings [were] held on these issues, including two formal hearings on November 20, 2006, and January 16, 2007, to discuss the unreasonable contest and undue delay of benefits. The . . . commissioner found that [the defendant] did not provide any medical reports that justified the delay in paying . . . Grady-Benson or [the delay in] scheduling . . . the MRI and bone scan recommended by . . . Grady-Benson.

"In his [f]inding and [a]ward of July 27, 2007, [the] commissioner . . . concluded that [the defendant had] unreasonably contested and delayed medical treatment benefits for the [plaintiff's] compensable knee injury . . . [and found that the defendant had] lacked a reasonable basis to delay payment for treatment, to contest the need for treatment, or to contest or delay the recommended diagnostic tests for the [plaintiff]. The commissioner concluded that the unreasonable delay of benefits was due to [the defendant's] own fault and neglect in handling the claim. The commissioner did not find any monetary benefits were delayed for which interest could be granted. The commissioner further found that the undue delay in medical treatment caused the [plaintiff's] attorney to expend substantially more time representing his client than would be reasonably expected. Therefore, pursuant to § 31-300 . . . the . . . commissioner ordered [the defendant] to pay [the plaintiff's] counsel $8000 to compensate for [forty] hours of legal time occasioned by the unreasonable delay, and penalized [the defendant] $500 pursuant to § 31-288 (b) (1) . . . . The [defendant and the plaintiff's employer] filed a motion to correct, seeking to interpose factual find-

---

[12] The board also found that the co-pay "remains unpaid." The defendant notes, however, that the $100 co-pay was "paid" on September 26, 2006. The plaintiff concedes that there is "some evidence" that the $100 co-pay was paid but that "the record is not clear as to when it was paid." Nevertheless, a determination of whether and when the $100 co-pay was paid is not necessary for the resolution of this appeal.

ings that [the defendant] did not act unreasonably and . . . [that the defendant was] legally immune from sanction. The . . . commissioner denied [the motion], and [the] appeal [to the board followed]."

The board concluded that the commissioner had properly imposed sanctions against the association[13] for its undue delay in processing the plaintiff's claim. In its decision, the board first concluded that the facts of *Pantanella* v. *Enfield Ford, Inc.*, supra, 65 Conn. App. 53, in which the Appellate Court upheld the award of attorney's fees, pursuant to § 31-300, against the association in another context, were "indistinguishable" from the facts of the present case, thereby requiring the board to abide by that decision unless the "inescapable logic" of the defendant's arguments required the board to overturn the commissioner's decision. (Internal quotation marks omitted.) The board then addressed the defendant's claim that the commissioner was without authority to impose sanctions on the association. The board concluded that [the association] was "deemed the insurer" under § 38a-841 (1) (b) because the sanctions were part of a "covered claim" within the meaning of § 38a-838 (5), thereby subjecting the association to the commissioner's authority to impose sanctions on an insurer under §§ 31-288 (b) (1) and 31-300. Additionally, the board concluded that the immunity provision of General Statutes § 38a-850, which provides that the association shall incur "no liability" for "any action taken or any failure to act" under the guaranty act, could not be read to divest the commissioner of the authority to impose sanctions under the Workers' Com-

---

[13] Although the commissioner appeared to impose the sanctions directly against the defendant rather than the association, the board deemed the association as the entity against which sanctions were imposed. Because the association ultimately was responsible for processing the plaintiff's claim under the guaranty act and the defendant merely was processing that claim on the association's behalf; see footnote 11 of this opinion; the board correctly deemed the association as the entity against which the sanctions were imposed.

pensation Act. The board concluded that, in addition to the statutory authority to impose sanctions, the commissioner also had the "common-law power to enforce orders of the tribunal,"[14] including "the right to sanction parties for violating orders of the tribunal."[15] For these reasons, the board concluded that the commissioner had the authority to impose sanctions against the association and it upheld the commissioner's imposition of sanctions and award of attorney's fees. This appeal followed.

I

The association is a creature of statute, and any basis for liability must be found within the provisions of the guaranty act, which define the scope and extent of the association's liability. See, e.g., *Esposito* v. *Simkins Industries, Inc.*, 286 Conn. 319, 338, 943 A.2d 456 (2007) ("the association's liability is dictated by the guaranty act"); cf. *Hunnihan* v. *Mattatuck Mfg. Co.*, 243 Conn. 438, 449, 705 A.2d 1012 (1997) ("the association is authorized to pay only covered claims . . . and must deny all other claims"). Therefore, we turn first to the question of whether the guaranty act obligates the association to pay the sanctions imposed by the commissioner.

A

The defendant first claims that the plain meaning of § 38a-850 grants the association immunity from the

[14] We assume that the board was using the term "tribunal" to refer to the institution of the workers' compensation commissioner.

[15] Although the board concluded that the commissioner had common-law authority to impose sanctions, the plaintiff did not defend this conclusion in his arguments before this court. The board's conclusion that the commissioner has common-law authority to impose sanctions is without merit, and we decline to address this issue further because we consistently have held that the authority of the workers' compensation commission is limited to what authority is delegated to it by the Workers' Compensation Act. See, e.g., *Stickney* v. *Sunlight Construction, Inc.*, 248 Conn. 754, 760–61, 730 A.2d 630 (1999).

sanctions imposed in the present case. The relevant portion of that statute provides: "There shall be no liability on the part of and no cause of action of any nature shall arise against . . . [the] association or its agents or employees . . . for any action taken or any failure to act by them in the performance of their powers and duties under sections 38a-836 to 38a-853,[16] inclusive." General Statutes § 38a-850. The board concluded that, because the phrases "no liability" and "no cause of action" are not defined in the statute, the meaning of each phrase is ambiguous. The board acknowledged that § 38a-850 may afford the association immunity against tort and contract actions but concluded that this immunity did not extend to sanctions imposed by a workers' compensation commissioner for undue delay in handling claims because the association's ability to delay claims without consequence could interfere "with the state's statutory obligation to operate an effective system of workers' compensation." (Internal quotation marks omitted.) On appeal, the defendant argues that the board incorrectly concluded that the association was not immune from sanctions under § 38a-850 because the plain meaning of the phrase "no liability . . . for any action taken or any failure to act" in § 38a-850 includes penalties imposed by the commissioner against the association for the performance of any of its duties under the guaranty act, including the processing of workers' compensation claims. The plaintiff maintains that the board properly determined that the meaning of "no liability" is ambiguous and that the board's limited interpretation of § 38a-850 was reasonable. We agree with the defendant.

We begin by setting forth the applicable standard of review. Our courts generally give great deference to the decision of an administrative agency and will disturb

---

[16] The guaranty act is codified at General Statutes §§ 38a-836 through 38a-853.

that decision only when the evidence in the record demonstrates that "the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Thomas* v. *Dept. of Developmental Services*, 297 Conn. 391, 398, 999 A.2d 682 (2010). When the case before the court presents only "pure questions of law," however, the standard of review is broader unless an agency's interpretation of a statute has previously been scrutinized by the courts or is "time-tested . . . ." Id. Because the interpretation of a statute raises only a pure question of law, and there is no claim that an agency's interpretation of the statutes relevant to this appeal has been time-tested or subject to prior judicial scrutiny, we exercise plenary review over the board's decision. See id., 399.

When interpreting a statute, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply." (Internal quotation marks omitted.) *Picco* v. *Voluntown*, 295 Conn. 141, 147, 989 A.2d 593 (2010). General Statutes § 1-2z[17] requires this court first to consider the text of the statute and its relationship to other statutes to determine its meaning. If, after such consideration, the meaning of the statutory text is plain and unambiguous and does not yield absurd or unworkable results, we cannot consider extratextual evidence of the meaning of the statute. E.g., *Saunders* v. *Firtel*, 293 Conn. 515, 525, 978 A.2d 487 (2009). Only if we determine that the text of the statute is not plain and unam-

---

[17] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

biguous may we look to extratextual evidence of its meaning, such as "the legislative history and circumstances surrounding its enactment . . . the legislative policy it was designed to implement, and . . . its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Thomas* v. *Dept. of Developmental Services*, supra, 297 Conn. 399. The proper test to determine whether the meaning of the text of a statute is ambiguous is "whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) Id.

In accordance with § 1-2z, we begin our analysis with the text of the statute. The relevant portion of General Statutes § 38a-850 provides that "[t]here shall be no liability on the part of and no cause of action of any nature shall arise against . . . [the] association or its agents or employees . . . for any action taken or any failure to act by them in the performance of their powers and duties under [the guaranty act]." The language of the statute can be broken into two parts. The first part of the statute provides a general rule vesting the association with immunity from "liability" and any "cause of action . . . ." General Statutes § 38a-850. The second part of the statute limits the extent of the immunity granted to only those liabilities resulting from "any action taken or any failure to act . . . in the performance of [the association's] powers and duties under [the guaranty act]." General Statutes § 38a-850. Thus, our resolution of this issue will turn on whether (1) sanctions imposed by a workers' compensation commissioner are a "liability" within the meaning of § 38a-850, and (2) the phrase "any action taken or any failure to act . . . in the performance of [the association's] powers and duties" encompasses undue delay in processing a claim under the Workers' Compensation Act.

1

We turn first to the issue of whether the term "liability" in § 38a-850 encompasses statutory sanctions imposed by a workers' compensation commissioner. The guaranty act does not define the term "liability." When a statute does not provide a definition, "words and phrases in a particular statute are to be construed according to their common usage. . . . To ascertain that usage, we look to the dictionary definition of the term." (Internal quotation marks omitted.) *Picco* v. *Voluntown*, supra, 295 Conn. 148; see also General Statutes § 1-1 (a).[18] Webster's Third New International Dictionary defines "liability" as "something for which one is liable . . . as . . . an amount that is owed whether payable in money, other property, or services," and defines "liable" as "bound or obligated according to law or equity . . . ." The sanctions imposed in the present case constitute "an amount that is owed [and] . . . payable in money," and an amount that the association is otherwise "bound or obligated" to pay. Webster's Third New International Dictionary. In his decision, the commissioner ordered the defendant to "pay a fine of $500" and to "pay the [plaintiff attorney's] fees in the amount of $8000" pursuant to § 31-288 (b) and § 31-300, respectively. Because the commissioner's imposition of sanctions obligated the association to pay an amount of money, we conclude that these sanctions fall within the plain meaning of the term "liability" in § 38a-850.[19]

---

[18] General Statutes § 1-1 (a) provides: "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly."

[19] The defendant argues that the association is immune from sanctions in the present case because the phrase "no cause of action of any nature" includes the imposition of statutory sanctions by a workers' compensation commissioner. Because we conclude that the association is immune from sanctions under that part of § 38a-850 shielding the association from "liability," we need not address the issue of whether the association is immune from sanctions because of the nature of the action against it.

The plaintiff argues that there is an "obvious ambiguity" in the term "liability" because "liability" could have more than one reasonable meaning, and urges us to restrict its meaning. Specifically, the plaintiff argues that " '[l]iability' could mean that [the association] is exempt only from civil liability arising out of direct actions brought against it" or "could mean that [it] is exempt from claims for excess coverage when . . . a verdict results in damages beyond the policy coverage." The plaintiff contends that the meaning of "liability" should not include sanctions imposed by the commissioner and that the association should be obligated to pay them. The plaintiff essentially would have us interpret § 38a-850 as providing that there are some liabilities that the association is responsible for "in the performance of [its] powers and duties" under the guaranty act despite the broad, clear phrasing of the statute that "[t]here shall be no liability . . . ." General Statutes § 38a-850. In effect, the plaintiff reads out of the statute the word "no," which immediately precedes the word "liability," and, instead, reads into the statute the word "some" immediately before the word "liability." This reading is not supported by the text of § 38a-850. Consistent with the plain language of the statute, we conclude that "no liability" means no liability and is clear and unambiguous.

2

Having determined that the sanctions imposed in this case are a "liability" within the plain meaning of § 38a-850, we now turn to the issue of whether this liability arose out of "any action taken or any failure to act" by the association or its agent "in the performance of [its] powers and duties under [the guaranty act]." General Statutes § 38a-850. We conclude that the facts of the present case fall within this limitation.

First, the association's liability for undue delay resulted from the failure of its agent, namely, the defen-

dant, to pay a claim and from the defendant's failure to approve medical treatment. Put another way, the association's liability arose from the defendant's failure to act. Second, the failure to act occurred during the performance of the association's statutory duties under the guaranty act. The association's obligation to pay a claim for workers' compensation benefits on behalf of an insolvent insurer arises under § 38a-841 (1), which is found in the guaranty act. See *Esposito* v. *Simkins Industries, Inc.*, supra, 286 Conn. 338–39 (association's obligation to pay claim derives from provisions of guaranty act). Because the duty to process a covered workers' compensation claim arises under § 38a-841 (1), the processing of such a claim is one of the association's "powers and duties under sections 38a-836 to 38a-853, inclusive." General Statutes § 38a-850. Accordingly, we conclude that the sanctions that the commissioner imposed are a liability that arises from the failure of the association, or its agent, to act during the performance of its statutory duties and that these sanctions fit squarely into the type of liability that § 38a-850 seeks to avoid. Thus, § 38a-850 affords the association immunity from the sanctions imposed by the commissioner.

The plaintiff argues that interpreting § 38a-850 to include sanctions by the commissioner will produce absurd and unworkable results. The plaintiff posits that a broad reading of the statute is absurd because, under such a reading, the association would be immune from insurance regulation, discovery sanctions, and even from sanctions imposed by a court, and would not be "[subject] to any liabilities for any misconduct . . . including . . . fraudulent or intentionally tortious conduct." The plaintiff further asserts that the association could act with impunity and "refuse to comply with any . . . order [of a workers' compensation commissioner or the insurance commissioner] without any liability." The plaintiff argues that, for these reasons, we

must conclude that "[s]uch an interpretation of § [38a-850] is absurd and therefore must be rejected in favor of . . . a [more] reasonable result." (Internal quotation marks omitted.) The plaintiff suggests that § 38a-850 is more reasonably interpreted to mean only "that [the association] enjoys immunity from liability for a *direct* action brought against it in the performance of its duties [and] not for sanctions [imposed by the commissioner]." (Emphasis added.)

We disagree that construing § 38a-850 to provide immunity from sanctions would produce an absurd or unworkable result by permitting the association to act with impunity or to refuse to comply with any order of a workers' compensation commissioner or the insurance commissioner. The immunity conferred on the association by § 38a-850 extends only to acts or a failure to act "in the performance of [its] powers and duties" under the guaranty act. General Statutes § 38a-850. Although § 38a-850 affords the association immunity from liability that arises while performing its duties, it does not dispense with the association's underlying obligation to perform those duties, including the duty to pay claims and to authorize treatment, under the guaranty act. Section 38a-841 (1) obligates the association to pay the underlying workers' compensation claim, and § 38a-850 does not insulate the association from this underlying statutory obligation. Indeed, the defendant concedes that, under § 38a-841 (2) (c),[20] the association may sue or be sued to compel it to "pay covered claims that are within [the association's] statutory obligations" as set forth in § 38a-841 (1). Thus, individual claimants are not left without a remedy to collect on their underlying claim or to enforce an order of a workers' compensation commissioner requiring the authorization of treatment.

---

[20] General Statutes § 38a-841 (2) provides in relevant part: "[The] association may . . . (c) sue or be sued . . . ."

Additionally, the immunity provision does not permit the association to act improperly in the handling of all claims without any consequences because other provisions of the guaranty act provide alternative mechanisms for ensuring that the association complies with its statutory obligations. The guaranty act gives the insurance commissioner considerable control over the association and the manner in which it carries out its statutory duties. For example, General Statutes § 38a-840[21] requires the insurance commissioner to approve the members of the association's board of directors, and General Statutes § 38a-842 (1)[22] provides that the insurance commissioner must approve any plan of operation for the association before such plan may take effect. Additionally, General Statutes § 38a-843 (2) (c)[23] provides a specific remedy for unsatisfactory claims handling by the association, or its agent, by empowering the insurance commissioner to "revoke the designation of any servicing facility if he finds claims are being handled unsatisfactorily." At oral argument before this court, the defendant acknowledged that § 38a-843 (2) (c) would permit the insurance commissioner to revoke

---

[21] General Statutes § 38a-840 provides in relevant part: "(1) The board of directors of [the] association shall consist of not less than five nor more than nine persons serving terms as established in the plan of operation under section 38a-842. The members of the board of directors shall be selected by member insurers subject to the approval of the commissioner. Vacancies on the board shall be filled for the remaining period of the term by a majority vote of the remaining members, subject to the approval of the commissioner. . . ."

Section 38a-838 (4) defines the term "commissioner" as the insurance commissioner for purposes of the guaranty act.

[22] General Statutes § 38a-842 provides in relevant part: "(1) (a) [The] association shall submit to the commissioner a plan of operation and any amendments thereto necessary or suitable to assure the fair, reasonable, and equitable administration of said association. The plan of operation and any amendments thereto shall become effective upon approval in writing by the commissioner. . . ."

[23] General Statutes § 38a-843 (2) provides in relevant part: "The commissioner may . . . (c) revoke the designation of any servicing facility if he finds claims are being handled unsatisfactorily."

the designation of the defendant as the association's "servicing facility" if he found that the defendant's handling of claims was unsatisfactory. The guaranty act also subjects the association to "examination and regulation" by the insurance commissioner; General Statutes § 38a-847;[24] and General Statutes § 38a-853[25] empowers the insurance commissioner to promulgate regulations that are necessary to carry out the intent of the guaranty act. Reading § 38a-850 in relation to the foregoing statutes, we conclude that nothing in § 38a-850 abrogates the import of these provisions of the guaranty act.

Moreover, the interpretation of § 38a-850 that the plaintiff urges finds no support in the text of the statute. General Statutes § 38a-850 provides in relevant part that "[t]here shall be no liability on the part of and no cause of action of any nature shall arise against" the association. The plaintiff asks us to restrict the meaning of this language to include only liability incurred from "direct action[s]" against the association. To do that, however, would read out the portion of the statute that provides that the association shall have no liability and that no cause of action of any nature shall arise against it. When a statute's plain and unambiguous language indicates that the statute is intended to have broader application, "we will not supply an exception or limitation to [that] statute . . . ." *Manifold* v. *Ragaglia*, 272 Conn. 410, 422, 862 A.2d 292 (2004); see id. (concluding that text of statutory immunity provision indicated that legislature intended for word "any" to have broad application). This result is no more absurd or unworkable than that of the sovereign immunity provisions of the

---

[24] General Statutes § 38a-847 provides in relevant part: "[The] association shall be subject to examination and regulation by the commissioner. . . ."

[25] General Statutes § 38a-853 provides: "The commissioner may promulgate such reasonable regulations as he deems necessary to carry out the intent of sections 38a-836 to 38a-853, inclusive. Such regulations may include definitions of the kinds of insurance specified in section 38a-837."

General Statutes, which provide immunity from liability that is similar to that granted to the association under § 38a-850.

3

In addition to its argument that the plain meaning of § 38a-850 provides immunity from sanctions imposed by the commissioner, the defendant argues that the immunity provision is consistent with the purpose and limitations of the guaranty act. The defendant asserts that, because the association is a nonprofit entity with limited ability to raise funds to cover insolvent insurers, and because a single insolvency can "exponentially" increase the demands on the association, the guaranty act vests the association with significant discretion in handling claims on behalf of those insurers. In response, the plaintiff contends that such reasoning is inapplicable because the legislature provided a statutory mechanism in § 38a-841 (1) (c)[26] that permits the association to delay payment because of a lack of funds resulting from a sudden increase in liabilities. Additionally, the plaintiff argues that our decisions in *Connecticut Ins. Guaranty Assn.* v. *State*, 278 Conn. 77, 896 A.2d 747 (2006), and *Casey* v. *Northeast Utilities*, 249 Conn. 365, 731 A.2d 294 (1999), indicate that we already have rejected similar arguments regarding the nature and purpose of the association.

Our conclusion in this case is consistent with our prior statements regarding the statutory purpose of the association. The association was created for the limited purpose of paying only "covered" claims on behalf of insolvent insurers to insureds who otherwise would

---

[26] General Statutes § 38a-841 (1) (c) provides in relevant part: "If the maximum assessment, together with the other assets of [the] association in any account, does not provide in any one year in any account an amount sufficient to make all necessary payments from that account, the funds available may be prorated and the unpaid portion shall be paid as soon thereafter as funds become available. . . ."

be left with a limited recovery, if any, following the insolvency of their insurer. General Statutes § 38a-841 (1). The association does not replace the insolvent insurer and does not assume all of the insolvent insurer's responsibilities and obligations. The guaranty act limits the extent of the association's obligations so that the association remains a limited purpose entity rather than a full service insurer. This understanding is reflected in our prior discussions regarding the purpose of the association. In reaching our decision in *Hunnihan* v. *Mattatuck Mfg. Co.*, supra, 243 Conn. 450–51, that the guaranty act excludes reimbursements to other insurers, we made the following observation regarding the statutory purpose of the association: "The association was established for the purpose of providing a limited form of protection for policyholders and claimants in the event of insurer insolvency. The protection it provides is limited based [on] its status as a nonprofit entity and the method by which it is funded. . . . [T]he association becomes obligated pursuant to § 38a-841, to the extent of covered claims within certain limits. . . . Because [General Statutes] § 38a-849 provides that insurers may pass on the costs of the assessments made against them by the association, it is in reality policyholders who pay for the protections afforded by the association. Limitations on the association's obligations, therefore, provide another form of protection against increased premiums for policyholders in addition to the primary protection afforded all claimants against losses resulting from insurer insolvency." (Citation omitted.) Id., 451. "The result is that policyholders, who in effect fund the association, pay only for protection for fellow policyholders and claimants in the event that an insurer becomes insolvent." Id., 452. This understanding of the statutory purpose was repeated in our decision in *Esposito* v. *Simkins Industries, Inc.*, supra, 286 Conn. 329–31. Our review of the statutory purpose

of the association, as stated in our prior decisions, indicates that the legislature intended the association to serve the limited purpose of protecting Connecticut residents from insolvent insurers only to "the extent of covered claims within certain limits"; *Hunnihan* v. *Mattatuck Mfg. Co.*, supra, 451; while also providing protection against increased insurance premiums by limiting the extent of the association's liability. Our conclusion that § 38a-850 provides the association with immunity from sanctions imposed by the commissioner is consistent with this purpose. The association remains statutorily obligated to pay any and all "covered claims"; General Statutes § 38a-841 (1); but is afforded immunity from monetary sanctions for its handling of those claims. Instead, as we discussed previously, the guaranty act provides for other mechanisms to ensure the association's compliance with its terms.

We also note that the cases on which the plaintiff relies, namely, *Connecticut Ins. Guaranty Assn.* v. *State*, supra, 278 Conn. 77, and *Casey* v. *Northeast Utilities*, supra, 249 Conn. 365, do not control our interpretation of the language of the immunity provision in § 38a-850. In *Connecticut Ins. Guaranty Assn.*, we concluded that a claim that the state made as a self-insurer fell within the meaning of the term "covered claim," as defined in § 38a-838 (5). *Connecticut Ins. Guaranty Assn.* v. *State*, supra, 91. Because the claim was one that the association was obligated to pay as a "covered claim" under § 38a-841 (1), the immunity provision in § 38a-850 was not implicated by the facts or relevant to our analysis in that case, and we did not address it. Our decision in *Casey* is not relevant to this case because it did not involve the association, the guaranty act, or the immunity provision of § 38a-850. See generally *Casey* v. *Northeast Utilities*, supra, 366–69. In *Casey*, we concluded that the second injury fund was liable for sanctions imposed by a workers' compensa-

tion commissioner for the mishandling of a claim. Id., 367, 383. *Casey* is distinguishable from this case, however, because the second injury fund is created and governed by the Workers' Compensation Act, and that act does not provide the second injury fund with immunity for its actions, unlike the guaranty act, which does provide such immunity for the association. We therefore conclude that the plain meaning of § 38a-850 vests the association with immunity from the sanctions imposed by the commissioner in the present case.

## B

Because we have determined that the association is statutorily immune from the sanctions that the commissioner imposed, the association can be liable for those sanctions only if they fall within the meaning of the term "covered claim," as defined in § 38a-838 (5), which the association is required to pay under § 38a-841 (1). The defendant claims that the board improperly determined that the sanctions imposed in the present case fall within the meaning of the term "covered claim" and that, because the sanctions fall outside of the plain meaning of the definition of "covered claim," the association is not obligated to pay the sanctions. The plaintiff argues that the board's decision was correct. We agree with the defendant.

In its decision, the board, relying on *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, 278 Conn. 779, 900 A.2d 18 (2006), initially determined that the intent of §§ 38a-838 (5) and 38a-841 (1) is to make the association liable to the same extent that the insurer would have been if it had not been insolvent. The board then concluded that "[t]here is no dispute that had the original insurer unreasonably delayed payment or unreasonably contested liability . . . the . . . commissioner could have imposed statutory sanctions." The board further concluded that the sanctions imposed "clearly [fell] within

the statutory definition of a 'covered claim' " because the defendant "[did] not identify any of the enumerated grounds in the statute [that] preclude the payment order [in the present case] . . . ." We disagree.

We begin with the board's conclusion that the definition of "covered claim" and our decision in *Fontaine* demonstrate that the association is liable to the same extent as the insolvent insurer would have been, including for sanctions. The relevant portion of General Statutes § 38a-838 (5) defines a "covered claim" as "an unpaid claim, including, but not limited to, one for unearned premiums, *which arises out of and is within the coverage and subject to the applicable limits of an insurance policy* . . . issued by an insurer, if such insurer becomes an insolvent insurer . . . ." (Emphasis added.) Thus, the language of the statute confines the extent of a covered claim to that "which arises out of and is within" the coverage of the underlying insurance policy. General Statutes § 38a-838 (5). The text of the definition thus excludes any liabilities beyond those that arise out of and are within the insolvent insurer's insurance policy. This reading is consistent with our decision in *Fontaine*, in which we noted that the association was obligated only "to the same extent that the insolvent insurer would have been liable *under its policy.*" (Emphasis added; internal quotation marks omitted.) *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, supra, 278 Conn. 791. There is no evidence in the record that the insurance policy in the present case included an obligation on the part of the insurer to pay statutory penalties and attorney's fees in the event that it caused undue delay in the processing or payment of a claim. In the absence of such evidence, we conclude that the obligation to pay the sanctions does not arise out of the coverage of the policy but, rather, that such obligation arises out of the association's conduct in handling the claim. Thus, we conclude

that the definition of "covered claim" limits the association's obligations to those found in the insolvent insurer's insurance policy and does not extend to liabilities arising from conduct in handling the claim if such a provision is not included in the policy.

The plaintiff nonetheless argues that the board properly determined that sanctions were part of a covered claim because sanctions are not among the enumerated exclusions listed in § 38a-838 (5) (i) through (v). We disagree. Simply because sanctions are not expressly *excluded* under the listed exclusions does not mean that sanctions necessarily must be *included* in the definition of the term "covered claim." The relevant inquiry is whether the sanctions are actually included in the definition because the association's obligation to pay a claim must be found in the guaranty act. See *Esposito* v. *Simkins Industries, Inc.*, supra, 286 Conn. 338–39. If the obligation is not found in the guaranty act, it does not exist, and the association is obligated to decline payment. As we already have determined, the plain meaning of the definition of "covered claim" set forth in § 38a-838 (5) does not include the sanctions imposed by the commissioner. It, therefore, is unnecessary to consider whether any of the exclusions to that definition apply.

The board also determined, and the plaintiff argues, that the workers' compensation commission may impose sanctions on the association in the same manner as it would on any insurer because General Statutes § 38a-841 (1) (b) provides that the association is "deemed the insurer to the extent of its obligations on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent . . . ." The plaintiff asserts that this language demonstrates that the association is liable to the same extent as any insolvent insurer would be if that insurer had not become insol-

vent. The statute, however, deems the association to be the insurer only "to the extent of its obligations on the covered claims . . . ." General Statutes § 38a-841 (1) (b); see *Hunnihan* v. *Mattatuck Mfg. Co.*, supra, 243 Conn. 449 (under § 38a-841 [1], "the association is authorized to pay only covered claims, and must deny all other claims"). Thus, because we already have determined that the sanctions in the present case do not fall within the definition of "covered claim" in § 38a-838 (5), the association is not "deemed the insurer" for purposes of any sanctions imposed by the commissioner.

The dissent argues that the term "covered claim" includes the sanctions imposed by the commissioner in the present case because sanctions should be covered under the terms of the underlying insurance policy. Specifically, the dissent concludes that "interest and attorney's fees assessed because of the unduly delayed payment of workers' compensation benefits arise out of the Workers' Compensation Act" and that "[t]he association is obligated to pay the full amount of any claim arising out of a workers' compensation policy, which is coextensive with the Workers' Compensation Act." To reach this conclusion, the dissent relies on General Statutes § 31-287,[27] which provides that a policy under the Workers' Compensation Act must cover "the entire liability of the *employer* thereunder . . . ." (Emphasis added.) The dissent goes on to state that, "under the Workers' Compensation Act, workers' compensation *insurers* specifically are deemed responsible for assessments of interest and fees for undue delay." (Emphasis added.) The dissent concludes that, "[t]herefore, policies issued by such insurers necessarily would cover assessments issued under § 31-300" and that, "unlike [with] other insurance policies, the legislature has mandated that workers' compensation policies be coexten-

---

[27] Section 31-287 is part of the Workers' Compensation Act.

sive with the Workers' Compensation Act." This conclusion, however, is flawed. General Statutes § 31-287 requires only that a workers' compensation policy cover "the entire liability of the *employer* thereunder . . . ." (Emphasis added.) Nothing in the text of that provision requires a workers' compensation insurance policy to cover the liability of the *insurer* or that the policy be "coextensive" with the entirety of the Workers' Compensation Act. Because the sanctions in the present case have been imposed against the association and not the plaintiff's *employer*, there is no basis to conclude that the insurance policy in the present case must have included coverage for the sanctions imposed. The association is not the employer; therefore, the fact that § 31-287 requires a workers' compensation insurance policy to cover the full liability of the employer is irrelevant. In the absence of any evidence that the sanctions imposed in this case were covered under the insolvent insurer's policy, we conclude that the sanctions are not part of a covered claim and that the association, therefore, is not obligated to pay them.[28]

[28] In addition to asserting that the insurance policy in the present case should have covered the sanctions imposed, the dissent also contends that, under the guaranty act, "claims against insolvent workers' compensation insurers are treated differently [from] claims against other insurers." The dissent then cites to four provisions in the guaranty act that make specific, limited exceptions for workers' compensation claims. The dissent first concludes that these exceptions demonstrate that "recovery for claims against insolvent workers' compensation insurers is more liberal than recovery available for claims against all other types of insurers." Nevertheless, even if the guaranty act does treat workers' compensation policies differently, in some circumstances, from automobile or life insurance policies, this fact is irrelevant to our analysis of the statutes in the present case because the statutes at issue do not distinguish between the type of insurance that the association is covering. The dissent also concludes that these four limited exceptions demonstrate that "the guaranty act specifically dictates that terms of recovery for workers' compensation claims shall be derived from the Workers' Compensation Act." The dissent reads too much out of these limited exceptions and reaches conclusions that are not supported by the text of the guaranty act. Under the dissent's broad reading, the exceptions would become the general rule. Indeed, the fact that the legislature provided certain specific exceptions for workers' compensation cases demonstrates

## II

In addition to its statutory arguments, the defendant claims that the board improperly concluded that it was bound by the Appellate Court's decision in *Pantanella* v. *Enfield Ford, Inc.*, supra, 65 Conn. App. 46, because *Pantanella* did not address the issue of whether the association is immune from sanctions or whether a sanction is part of a covered claim. In its decision, the board concluded that the facts of the present case were "indistinguishable" from those in *Pantanella* and, therefore, that it was required to follow it. Because the Appellate Court in *Pantanella* upheld an award of attorney's fees against the association under § 31-300; id., 53; the board concluded in the present case that *Pantanella* affirmed the "power [of workers' compensation commissioners] to levy statutory sanctions against [the association] . . . ." The plaintiff argues that the board properly followed the Appellate Court's decision in *Pantanella*. We disagree with the plaintiff.

In *Pantanella*, the Appellate Court upheld the board's determination that the evidence in that case supported an award of attorney's fees, under § 31-300, against the

that, when the legislature intends to treat workers' compensation cases differently, it does so with a specific exception. See, e.g., *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 299, 933 A.2d 256 (2007) (legislature knows how to convey its intent expressly). The legislature did not provide any exception for sanctions under the Workers' Compensation Act in the immunity granted to the association under § 38a-850, and the legislature provided no separate definition for "covered claims" arising out of a workers' compensation policy. It would be improper for this court to supply an exception that the legislature has not provided for in the statute. See, e.g., *Bloomfield* v. *United Electrical, Radio & Machine Workers of America, Connecticut Independent Police Union, Local 14*, 285 Conn. 278, 289, 939 A.2d 561 (2008) ("[I]t is a principle of statutory construction that a court must construe a statute as written. . . . Courts may not by construction supply omissions . . . or add exceptions merely because it appears that good reasons exist for adding them. . . . It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is a function of the legislature." [Internal quotation marks omitted.]).

association for undue delay in the payment of benefits. *Pantanella* v. *Enfield Ford, Inc.*, supra, 65 Conn. App. 53. The Appellate Court in *Pantanella*, however, did not address or resolve the issues raised in the present appeal because it did not address the provisions of the guaranty act. Specifically, the court did not address whether § 38a-850 provided the association with immunity from sanctions, such as an award of attorney's fees under § 31-300, and did not address whether sanctions were part of a "covered claim" under §§ 38a-841 (1) and 38a-838 (5). The court's discussion of the issue was limited to the following: "[The association] first claims that the board improperly affirmed the commissioner's award of attorney's fees. We disagree.

"The commissioner found that on September 28, 1995, he had ordered that no further evidence would be admitted. [The association] ignored the commissioner's order by attempting, on a number of occasions, to introduce the transcript of the deposition of [a treating physician]. The commissioner also found that the litigation that resulted from [the association's] attempts to introduce the deposition caused undue delay in the payment of benefits to the plaintiff. On the basis of his findings, the commissioner awarded attorney's fees.

"Applying § 31-300 to the facts as found by the commissioner, [the court] conclude[s] that the board properly affirmed the award of attorney's fees." Id.

This brief discussion by the Appellate Court focuses entirely on whether an award of attorney's fees under § 31-300 of the Workers' Compensation Act was warranted by the evidence. The court did not address the guaranty act or whether the immunity provision in § 38a-850 would provide the association with immunity from such an award or whether an award of attorney's fees is part of a "covered claim," as that term is defined in § 38a-838 (5). Indeed, the lack of any mention of

these issues in *Pantanella* indicates that these arguments were not even raised before the Appellate Court.[29] Because the Appellate Court in *Pantanella* did not actually address the issues in the present case, the board should not have relied on *Pantanella* as being dispositive of the issues before it. See, e.g., *State* v. *Ouellette*, 190 Conn. 84, 91, 459 A.2d 1005 (1983) ("[i]t is a general rule that a case resolves only those issues explicitly decided in the case"); *Connecticut Light & Power Co.* v. *Costle*, 179 Conn. 415, 416 n.1, 426 A.2d 1324 (1980) (same).

Additionally, the board's decision appears to conflate our past discussions of stare decisis, a doctrine pursuant to which a court follows *its own* prior decisions, with the concept of binding precedent, pursuant to which an inferior court follows the decisions of a higher court. Although we note that the terms "stare decisis" and "precedent" are often used interchangeably; see F. Schauer, "Precedent," 39 Stan. L. Rev. 571, 576 n.11 (1987) (noting that "contemporary usage has collapsed much of the difference between precedent and stare decisis"); it is important that the concepts represented by the terms remain distinct because they involve different considerations.[30] The purpose of the doctrine of stare decisis is to provide continuity in our decision making. "This court has repeatedly acknowledged the significance of stare decisis to our system of jurispru-

---

[29] The plaintiff also argues that the fact that the association did not raise the immunity argument in *Pantanella* "demonstrates that [the association's] prior interpretation of the [g]uaranty [a]ct was that it is not immune to the imposition of these sanctions." The association's failure to raise the issue of immunity in a separate case, however, has no bearing on our resolution of its applicability in the present case.

[30] "Lower courts, for example, are expected to respect the decisions of higher courts. But the hierarchical ordering of [decision makers] implicates considerations different from those involved when a [decision maker] is constrained by its previous actions as opposed to the orders of its superiors in the hierarchy." F. Schauer, supra, 39 Stan. L. Rev. 576.

dence because it gives stability and continuity to our case law." *Conway* v. *Wilton*, 238 Conn. 653, 658, 680 A.2d 242 (1996). We, therefore, will respect our prior decisions unless strong considerations to the contrary require us to reexamine them. See id. ("[s]tare decisis is a formidable obstacle to any court seeking to change its own law" [internal quotation marks omitted]). For example, we may overturn a prior holding if we find it to be "clearly wrong"; (internal quotation marks omitted) id., 660; or when "the most cogent reasons and inescapable logic" require us to do so. *Herald Publishing Co.* v. *Bill*, 142 Conn. 53, 62, 111 A.2d 4 (1955).

Although the doctrine of stare decisis permits a court to overturn *its own* prior cases in limited circumstances, the concept of binding precedent prohibits a trial court from overturning a prior decision of an appellate court. This prohibition is necessary to accomplish the purpose of a hierarchical judicial system. A trial court is required to follow the prior decisions of an appellate court to the extent that they are applicable to facts and issues in the case before it, and the trial court may not overturn or disregard binding precedent. See, e.g., *Stuart* v. *Stuart*, 297 Conn. 26, 45–46, 996 A.2d 259 (2010) ("it is manifest to our hierarchical judicial system that this court has the final say on matters of Connecticut law and that the Appellate Court and Superior Court are bound by our precedent"); *Jolly, Inc.* v. *Zoning Board of Appeals*, 237 Conn. 184, 195, 676 A.2d 831 (1996) ("It is axiomatic that a trial court is bound by Supreme Court precedent. . . . This principle is inherent in a hierarchical judicial system. . . . [R]evision of Supreme Court precedent is not the trial court's function." [Citations omitted.]).

In the present case, it appears that the board misunderstood this distinction. In its decision, the board stressed "the importance of stare decisis" in following *Pantanella* and indicated that it could decide not to

follow it only if "inescapable logic" so required. (Internal quotation marks omitted.) In reaching its determination, the board relied in part on our decision in *Herald Publishing Co.*, in which we observed that "a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." *Herald Publishing Co.* v. *Bill*, supra, 142 Conn. 62. The board's reliance on this case was mistaken because the court's discussion in *Herald Publishing Co.* referred to the doctrine of stare decisis and discussed a standard for determining when a court might overrule *its own* prior decisions. The board, however, was not determining whether to overrule one of its own decisions; rather, it was determining whether to follow a prior decision of the Appellate Court. Because the board does not have the authority either to overrule or to decline to follow a decision of the Appellate Court, the board improperly addressed the issue of whether "inescapable logic" required it to disregard the Appellate Court's decision in *Pantanella*. The only decision for the board to make regarding *Pantanella* was whether it was binding precedent that controlled the board's resolution of the issues before it. As we already have discussed, the Appellate Court's decision in *Pantanella* did not address the issues raised in the present appeal, and, therefore, the board improperly concluded that it was bound by that decision.

The plaintiff argues, however, that "[i]t is irrelevant that the Appellate Court did not expressly address [in *Pantanella*] the issue of whether [the association] is statutorily immune [from] the imposition of penalties . . . ." The plaintiff argues that, instead, "what is relevant is that the Appellate Court affirmed an award of attorney's fees against [the association] thus confirming . . . [that the association] is not immune from them." For this reason, the plaintiff argues, *Pantanella* controls on the issue of whether a workers' compensation com-

missioner may impose sanctions against the association, the board was bound to follow it, and *Pantanella* should not be overruled unless it is clearly wrong. In support of his argument, the plaintiff cites to our decision in *Conway* v. *Wilton*, supra, 238 Conn. 653, in which this court recognized an exception to stare decisis when the court determines that a prior decision is "clearly wrong." (Internal quotation marks omitted.) Id., 660.

The plaintiff's arguments are without merit. First, the plaintiff's assertion that *Pantanella* confirms that the association is not immune from sanctions, despite the lack of discussion regarding immunity in that case, ignores our prior cases that demonstrate that a case resolves only the issues explicitly decided by the court. See, e.g., *State* v. *Ouellette*, supra, 190 Conn. 91. The plaintiff concedes that the Appellate Court did not address the issue of immunity in *Pantanella*. As we discussed previously, *Pantanella* is inapposite because it does not address the specific issues raised in this appeal. The board thus incorrectly concluded that it was bound by *Pantanella*.

Second, even if the Appellate Court's decision in *Pantanella* was relevant to the present case, the plaintiff incorrectly contends that we first would need to determine that the decision is "clearly wrong." (Internal quotation marks omitted.) *Conway* v. *Wilton*, supra, 238 Conn. 660. We look to whether a decision is clearly wrong as a guiding principle only when considering whether to overturn a prior holding of this court. Decisions of the Appellate Court are not binding on this court, and we are not required to determine in the first instance that the decision is clearly wrong before overturning a decision of the Appellate Court. See, e.g., *State* v. *Samuels*, 273 Conn. 541, 553 n.8, 871 A.2d 1005 (2005) ("[this court is] not bound by a decision of the Appellate Court").

The plaintiff also asserts that "[t]his court affirmed the Appellate Court's decision" in *Pantanella*. The plaintiff is mistaken. This court denied the petition for certification to appeal from the Appellate Court's decision. See *Pantanella* v. *Enfield Ford, Inc.*, 258 Conn. 930, 783 A.2d 1029 (2001) ("[t]he petition by the [association] for certification for appeal from the Appellate Court . . . is denied" [citation omitted]). We have made it clear that a denial of a petition for certification to appeal does not signify that this court approves of or affirms the decision or judgment of the Appellate Court. See, e.g., *Grieco* v. *Zoning Commission*, 226 Conn. 230, 233 n.5, 627 A.2d 432 (1993) ("The exercise of discretionary jurisdiction, by way of certification, is premised on the understanding that a denial of discretionary review leaves the underlying judgment in place without an endorsement of its merits. [A] denial of certification does not necessarily indicate our approval either of the result reached . . . or of the opinion rendered . . . ." [Internal quotation marks omitted.]). Therefore, even if the Appellate Court's decision in *Pantanella* was relevant to the issues in this appeal, it would still be unnecessary to consider whether the decision was clearly wrong because it is not a decision of this court.

In sum, we conclude that § 38a-850 provides the association with immunity from the statutory sanctions that the commissioner imposed and that such sanctions are not included in the definition of "covered claim" in § 38a-838 (5). The Appellate Court's decision in *Pantanella* does not affect our conclusion. Accordingly, the association is not subject to the sanctions that the commissioner imposed in the present case.[31]

---

[31] The dissent misconstrues the decisions from other states that have interpreted nearly identical statutes granting immunity to their respective guaranty associations; those cases are consistent, not incompatible, with our decision in the present case. Recently, in *Property & Casualty Ins. Guaranty Corp.* v. *Yanni*, 397 Md. 474, 919 A.2d 1 (2007), the plain meaning of certain Maryland statutory provisions that provide immunity similar to

The decision of the board is reversed and the case is remanded to the board with direction to reverse the commissioner's decision to impose sanctions and to award attorney's fees.

In this opinion ROGERS, C. J., and NORCOTT, PALMER, VERTEFEUILLE and McLACHLAN, Js., concurred.

KATZ, J., dissenting. The majority concludes that, if an assessment of interest and attorney's fees for an undue delay of payment of workers' compensation benefits falls within the meaning of a " '[c]overed claim' " under the Connecticut Insurance Guaranty Association Act (guaranty act), General Statutes, §§ 38a-836 through

that provided in § 38a-850 led the Maryland Court of Appeals to conclude that Maryland's property and casualty insurance guaranty corporation was immune from sanctions imposed by the Maryland workers' compensation commission; id., 478, 494; and that those sanctions were not part of a "covered claim" within the meaning of the statutory scheme. (Internal quotation marks omitted.) Id., 478, 490. The courts of other states also have reached the same conclusion. See, e.g., *Mosley* v. *Industrial Claim Appeals Office*, 119 P.3d 576, 579 (Colo. App. 2005), cert. denied sub nom. *Mosley* v. *Colorado Ins. Guaranty Assn.*, Docket No. 05SC343, 2005 Colo. LEXIS 736 (Colo. August 22, 2005); *Caufield* v. *Leonard*, 676 So. 2d 1117, 1119–20 (La. App.), cert. denied, 681 So. 2d 1262 (La. 1996); see also *Nebraska Life & Health Ins. Guaranty Assn.* v. *Dobias*, 247 Neb. 900, 903–905, 531 N.W.2d 217 (1995) (discussing cases in which it was concluded that sanctions were not part of covered claim under guaranty statutes because such sanctions did not arise out of insurance policy). The only state that has not come to the same conclusion is Rhode Island. See *Callaghan* v. *Rhode Island Occupational Information Coordinating Committee/Industry Educational Council of Labor*, 704 A.2d 740 (R.I. 1997). The court in *Callaghan* held that the Rhode Island insurers insolvency fund was not immune from sanctions by the Rhode Island workers' compensation court and that such sanctions are part of a covered claim. Id., 745–47. In so holding, the court found the language of the liability provision to be broad but nevertheless restricted its meaning. See id., 746–47. Courts analyzing the *Callaghan* decision have rejected its approach as "not persuasive because it represents the solitary minority view and is contrary to the purposes of the [guaranty statutes]." *Mosley* v. *Industrial Claim Appeals Office*, supra, 580; see also *Property & Casualty Ins. Guaranty Corp.* v. *Yanni*, supra, 497–98.

38a-853, the immunity provision of that act, General Statutes § 38a-850,[1] cannot bar payment of such a claim. It further concludes, however, that the assessment at issue in the present case is not a covered claim. I disagree. Specifically, the guaranty act recognizes the distinct nature of a workers' compensation policy, due to the mandates of the Workers' Compensation Act, General Statutes § 31-275 et seq., and thereby deems such an assessment a covered claim under the guaranty act. Indeed, the text of the guaranty act and the history of the treatment of claims against insolvent insurers under the Workers' Compensation Act, demonstrate a clear legislative intent to afford greater recovery for workers' compensation claims than for other claims that fall under the guaranty act. Because I conclude that an assessment of interest and attorney's fees under the Workers' Compensation Act is a covered claim under the guaranty act, I disagree with the majority that § 38a-850 shields the Connecticut Insurance Guaranty Association (association) from the assessment by the workers' compensation commissioner for the third district (commissioner) of interest and attorney's fees for the association's undue delay in paying workers' compensation benefits owed to the plaintiff, James Potvin.

In order to provide context to the meaning of a covered claim as applied to a workers' compensation policy, I begin with the clear evidence in the guaranty act that claims against insolvent workers' compensation insurers are treated differently than claims against other insurers. The guaranty act divides the source of recovery for claims against insolvent insurers into three sepa-

---

[1] General Statutes § 38a-850 provides: "There shall be no liability on the part of and no cause of action of any nature shall arise against any member insurer, said association or its agents or employees, the board of directors, or any person serving as an alternate or substitute representative of any director or the commissioner or his representatives for any action taken or any failure to act by them in the performance of their powers and duties under sections 38a-836 to 38a-853, inclusive."

rate accounts, one of which is dedicated solely to workers' compensation insurance. General Statutes § 38a-839 ("[f]or the purposes of administration and assessment, [the] association shall be divided into three separate accounts: [a] [t]he workers' compensation insurance account; [b] the automobile insurance account; and [c] an account for all other insurance to which sections 38a-836 to 38a-853, inclusive, apply"). Although every other claim covered by the guaranty act must be filed within two years of an insurer's declaration of insolvency, workers' compensation claims are controlled by the limitations period set forth under the Workers' Compensation Act, which can extend considerably longer. See General Statutes § 38a-841 (1) (a) (ii) (B) (requiring that association "be obligated for any claim filed with the association after the expiration of two years from the date of the declaration of insolvency unless such claim arose out of a workers' compensation policy and was timely filed in accordance with [General Statutes §] 31-294c [of the Workers' Compensation Act]"); see, e.g., *Ricigliano* v. *Ideal Forging Corp.*, 280 Conn. 723, 727, 912 A.2d 462 (2006) (claim filed six years after claimant was diagnosed with multiple myeloma deemed timely under Workers' Compensation Act because it was filed within three years of claimant's knowledge of causal connection between disease and employment). In setting forth the scope and limitations of a covered claim, which is defined as "an unpaid claim . . . [that] arises out of and is within the coverage and subject to the applicable limits of an insurance policy to which sections 38a-836 to 38a-853, inclusive, apply"; General Statutes § 38a-838 (5); the guaranty act sets a cap on payments of all such covered claims, except that the association "shall pay the *full amount* of any such claim *arising out of a workers' compensation policy* . . . ." (Emphasis added.) General Statutes § 38a-841 (1) (a) (ii).

These provisions demonstrate two principles. First, recovery for claims against insolvent workers' compensation insurers is more liberal than recovery available for claims against all other types of insurers. See also General Statutes § 38a-838 (5) (B) (iii) (exempting workers' compensation claimants from exclusion under definition of " '[c]overed claim' " for nonresidents filing claim against insurers having above specified net worth). Second and more significantly, whereas the terms and limits of compensation for other claims are derived from the guaranty act, the guaranty act specifically dictates that terms of recovery for workers' compensation claims shall be derived from the Workers' Compensation Act. This distinction is of paramount significance when divining whether the assessment at issue falls within the scope of a covered claim. Because a covered workers' compensation claim must extend to "the full amount of any such [covered] claim arising out of a workers' compensation policy"; General Statutes § 38a-841 (1) (a) (ii); the question is whether an assessment of interest and attorney's fees under General Statutes § 31-300 arises out of a workers' compensation policy. That question must be answered in the affirmative.

The Workers' Compensation Act clearly mandates that "[n]o policy of insurance against liability under [the Workers' Compensation Act] . . . shall be made unless the same covers the *entire liability* of the employer thereunder . . . ."[2] (Emphasis added.) General Statutes § 31-287. As a general matter, I agree with

---

[2] Therefore, the majority's statement that "[t]here is no evidence in the record that the insurance policy in the present case included an obligation on the part of the insurer to pay statutory penalties and attorney's fees in the event that it caused undue delay in the processing or payment of a claim," presupposes that workers' compensation insurers are issuing policies in violation of a legislative mandate. I assume, in the absence of evidence to the contrary, that workers' compensation insurers will not act contrary to their legal obligations.

the majority that the term liability is an expansive one that generally would encompass an assessment of interest or attorney's fees. See Black's Law Dictionary (6th Ed. 1990) (Defining "[l]iability" as follows: "The word is a broad legal term. . . . It has been referred to as of the most comprehensive significance, including almost every character of hazard or responsibility, absolute, contingent or likely. It has been defined to mean: all character of debts and obligations . . . ." [Citation omitted.]). Moreover, under the Workers' Compensation Act, workers' compensation insurers specifically are deemed responsible for assessments of interest and fees for undue delay. See General Statutes § 31-300 (permitting such assessments "[i]n cases where, through the fault or neglect of the employer *or insurer*, adjustments of compensation have been unduly delayed, or where through such fault or neglect, payments have been unduly delayed" [emphasis added]). Indeed, such assessments are "include[d] in the [commissioner's] award . . . ." General Statutes § 31-300. Therefore, policies issued by such insurers necessarily would cover assessments issued under § 31-300. See, e.g., *Imbrogno* v. *Stamford Hospital*, 28 Conn. App. 113, 125–26, 612 A.2d 82 (remanding case for further award of interest pursuant to § 31-300 on medical bills for which commissioner found payment by defendant employer and defendant insurer unduly delayed), cert. denied, 223 Conn. 920, 615 A.2d 507 (1992). Thus, unlike other insurance policies, the legislature had mandated that workers' compensation policies be coextensive with the Workers' Compensation Act.

Indeed, in a 1993 decision, the workers' compensation review board (board) rejected the precise arguments advanced by the association in the present case in light of the aforementioned provisions and the particular nature of claims arising out of a workers' compensation policy. See *Versage* v. *Kurt Volk, Inc.*, 11 Conn.

Workers' Comp. Rev. Op. 253 (1993). The association had claimed in that case that the guaranty act precluded an award of interest under the Workers' Compensation Act for delayed payment because the interest was not a covered claim and was barred by the immunity provision. Id., 258. In rejecting the first contention, the board persuasively explained: "The [g]uaranty [a]ct's definition of a 'covered claim' is important to understanding the obligations of [the association] under the [guaranty] [a]ct. For purposes of this case, a 'covered claim' is 'an unpaid claim . . . which arises out of and is within the coverage and subject to the applicable limits of an insurance policy . . . issued by an [insolvent] insurer. . . .' General Statutes [§] 38a-838 (6). [The association] argues that the commissioner's award of interest does not arise out of or within the coverage of the workers' compensation insurance policy between the respondent-employer and the insolvent insurer. Instead, the interest award, according to [the association], arose by way of the workers' compensation statute. We reject this narrow reading of the [g]uaranty [a]ct.

"The [g]uaranty [a]ct's definition of 'covered claim' must be understood in the context of the statutes governing the underlying insurance policies [which] it protects. See *Connecticut Insurance Guaranty Association* v. *Union Carbide Corporation*, 217 Conn. 371, 378–79 [585 A.2d 1216] (1991). With regard to workers' compensation insurance policies, we must examine the requirements of General Statutes [§] 31-287. 'No policy of insurance against liability under [the Workers' Compensation Act] . . . shall be made unless the same covers the entire liability of the employer thereunder. . . .' General Statutes § 31-287. In light of this requirement that workers' compensation insurance cover an employer's *entire liability* under the [Workers' Compensation Act], *there can be no distinction between a compensation award which arises out of a workers'*

*compensation policy and one that arises out of the workers' compensation statute.* See *Plainville* v. *Travelers Indemnity Co.*, 178 Conn. 664, 674 [425 A.2d 131] (1979). By virtue of [§] 31-287, *they are necessarily one and the same.*"[3] (Emphasis altered.) *Versage* v. *Kurt Volk, Inc.*, supra, 11 Conn. Workers' Comp. Rev. Op. 258.

In rejecting the association's immunity argument in *Versage*, the board also examined the limited case law from other jurisdictions and reasoned that the guaranty act's immunity provision is intended to bar tort actions or statutory actions for interest and fees for untimely payment of claims, but not claims arising under a workers' compensation policy itself.[4] Id., 260. The board noted that a contrary interpretation would thwart the legislative policies underlying the Workers' Compensation Act. Id., 261. It therefore reasoned that "the 'covered claim' and immunity provisions must be read together." Id., 260. In other words, the board determined that a covered claim is not barred by the immunity provision. The assessment of interest for delayed payment of a workers' compensation claim, therefore, differs from statutory or common-law penalties for

[3] Perhaps because *Versage* is not of recent vintage, the board in the present case overlooked this precedent. There is no indication in the board's subsequent opinions that it has disavowed this reasoning and, indeed, there would be no basis to do so.

[4] I note that there is little case law from other jurisdictions specifically addressing whether an assessment of interest and/or attorney's fees under a workers' compensation scheme is barred by immunity provisions of a guaranty act. There is a split of authority among those jurisdictions. Compare *Callaghan* v. *Rhode Island Occupational Information Coordinating Committee/Industry Educational Council of Labor*, 704 A.2d 740, 747 (R.I. 1997) (unanimous court concluding that immunity provision does not apply) with *Mosley* v. *Industrial Claim Appeals Office*, 119 P.3d 576, 579 (Colo. App. 2005) (three judge panel concluding that immunity provision applies), cert. denied sub nom. *Mosley* v. *Colorado Ins. Guaranty Assn.*, Docket No. 05SC343, 2005 Colo. LEXIS 736 (Colo. August 22, 2005), and *Property & Casualty Ins. Guaranty Corp.* v. *Yanni*, 397 Md. 474, 500, 919 A.2d 1 (2007) (five justices concluding, with two justices dissenting, that immunity provision applies).

delayed payment of other types of claims because the former is covered under, and arises out of, the policy itself, which, by law, is coextensive with liability under the Workers' Compensation Act, not some source external to the policy. See *Plainville* v. *Travelers Indemnity Co.*, supra, 178 Conn. 674.

The rationale for allowing the commissioner to assess interest and attorney's fees against the association for its unduly delayed payment of workers' compensation benefits while the association may not be liable for its delayed payment of other types of insurance benefits may be explained not only by the statutory mandates of the Workers' Compensation Act but also by the history of the treatment of claims against insolvent workers' compensation insurers. For twelve years preceding the enactment of the guaranty act in 1971; see Public Acts 1971, No. 466; the Workers' Compensation Act provided a mechanism, through the second injury fund, to allow workers to recover for awards made against insolvent workers' compensation insurers. See Public Acts 1959, No. 580, §§ 12, 13 (renaming second injury fund "the second injury and compensation assurance fund" and making fund responsible for covering workers' compensation awards against insolvent insurers).[5] The subsequent enactment of the guaranty act created a similar mechanism for claims against other types of insolvent insurers. Although the guaranty act included workers' compensation insurers, because that coverage was duplicative of the coverage provided under the Workers' Compensation Act, for the first fifteen years

[5] Number 580, § 13, of the 1959 Public Acts, later codified at General Statutes § 31-355, provided in relevant part: "When an award of compensation shall have been made under the provisions of chapter 566 of the general statutes [the Workers' Compensation Act] against an employer who has failed to comply with the provisions of said chapter or who is insolvent or whose insurer is insolvent, such payments shall be made and such compensation provided from the second injury and compensation assurance fund . . . ."

after the enactment of the guaranty act, the second injury fund continued to pay claims against insolvent workers' compensation insurers. Responsibility for such claims finally was transferred to the association through a 1986 amendment to the Workers' Compensation Act. See Public Acts 1986, No. 86-35, § 1 (b);[6] see also 29 H.R. Proc., Pt. 3, 1986 Sess., p. 845, remarks of Representative Francis X. O'Neill, Jr.[7] Thus, differential treatment of workers' compensation claims under the guaranty act arises from the differences in both the legislative mandate and the historical treatment of such claims.

In sum, interest and attorney's fees assessed because of the unduly delayed payment of workers' compensation benefits arise out of the Workers' Compensation Act. The association is obligated to pay the full amount of any claim arising out of a workers' compensation policy, which is coextensive with the Workers' Compensation Act. The majority rejects this conclusion, however, by reasoning that, because the Workers' Compensation Act mandates that the policy cover the full extent of the *employer's* liability, but does not expressly impose that mandate with respect to the *insurer's* liability, and because the association is assuming the insurer's liability, the association cannot be deemed responsible to the full extent of liability

---

[6] Number 86-35, § 1 (b), of the 1986 Public Acts, later codified at General Statutes § 31-355 (e), provided: "Notwithstanding the provisions of subsection (a) of this section, whenever the employer's insurer has been determined to be insolvent, as defined in section 38-275, such payments shall be the obligation of the [association] pursuant to the provisions of chapter 687."

[7] Representative O'Neill explained: "This particular bill merely states that the—in the past, [the association] when an insurance company that had been paying mon[eys] for a second injury premium-type situation, when it went defunct in this particular state, the [s]econd [i]njury [f]und would pick up that payment. Even though [the association] would guarantee those particular funds. This bill states that the first person to actually pay the funds will be [the association]. And it will no longer will be the [s]econd [i]njury [f]und." 29 H.R. Proc., supra, p. 845.

under the Workers' Compensation Act. This logic contravenes both the Workers' Compensation Act and basic principles of insurance law. Section 31-287 of the Workers' Compensation Act makes clear that the insurer steps in the shoes of the employer and is directly obligated to the employee to the same extent as the employer. That section provides in relevant part: "No policy of insurance against liability under this chapter, except as provided in section 31-284, shall be made unless the same covers the entire liability of the employer thereunder *and contains an agreement by the insurer that, as between the employee and the insurer,* notice or knowledge of the occurrence of injury by the insured shall be deemed notice or knowledge by the insurer, that jurisdiction of the insured for the purposes of this chapter shall be jurisdiction of the insurer and *the insurer shall in all things be bound by and subject to the findings, awards and judgments rendered against such insured; and also that, if the insured becomes insolvent or is discharged in bankruptcy during the period that the policy is in operation . . . an injured employee or other person entitled to compensation under the provisions of this chapter may enforce his claim to compensation against the insurer to the same extent that the insured could have enforced his claim against such insurer had he paid compensation.*" (Emphasis added.) General Statutes § 31-287. This identity of interest between the insurer and the insured employer under the policy in relation to the employee is a bedrock principle of workers' compensation. See, e.g., General Statutes § 31-279 (c) (1) ("[a]ny employer or any insurer acting on behalf of an employer, may establish a plan, subject to the approval of the chairman of the Workers' Compensation Commission under subsection [d] of this section, for the provision of medical care that the employer provides for treatment of any injury or illness under this chapter");

General Statutes § 31-288 (b) (1) ("[w]henever through the fault or neglect of an employer or insurer, the adjustment or payment of compensation due under this chapter is unduly delayed, such employer or insurer may be assessed by the commissioner hearing the claim a civil penalty of not more than one thousand dollars for each such case of delay, to be paid to the claimant"); General Statutes § 31-294d (a) (1) ("[t]he employer, any insurer acting on behalf of the employer, or any other entity acting on behalf of the employer or insurer shall be responsible for paying the cost of such prescription drugs [for an injured employee] directly to the provider"); General Statutes § 31-299b ("[i]f an employee suffers an injury or disease for which compensation is found by the commissioner to be payable according to the provisions of this chapter, the employer who last employed the claimant prior to the filing of the claim, or the employer's insurer, shall be initially liable for the payment of such compensation"). Indeed, where an employer chooses to self-insure rather than obtain coverage through a private insurance carrier; see General Statutes § 31-345; the insured and the insurer are, in fact, one in the same.

Moreover, as a general matter, if one were to extend the majority's logic to other insurance policies covered by the guaranty act, there would be no covered claims for which the association would be liable because no insurance policy treats the insurer as the insured (in the present case, the employer). By issuing a policy, an insurer becomes liable to the full extent to which it obligates itself under the policy. The difference between other types of insurers and workers' compensation insurers, of course, is that the former are not obligated by law to cover penalties for the unduly delayed payment of benefits. Therefore, I would affirm the decision of the board in the present case ordering the association to pay the assessment of interest and attorney's fees.

Accordingly, I respectfully dissent.